No. 25-10196

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

JENNIFER THOMPSON,
*Plaintiff-Appellant*,

v.

ACY MCGEHEE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF GODLEY; CITY OF GODLEY, TEXAS; MATTHEW CANTRELL, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS INTERIM POLICE CHIEF OF THE GODLEY POLICE DEPARTMENT; JEREMY ARBUTHNOT, BADGE #980; SPENCER TEMPLER, BADGE #985,
*Defendants-Appellees*.

.

---

On Appeal from the United States District Court for the
Northern District of Texas, Dallas Division
Civil Action No. 3:23-CV-1441-N

---

## CORRECTED BRIEF OF APPELLANT JENNIFER THOMPSON

---

CARTER ARNETT PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206
Telephone: (214) 550-8188
Fax: (214) 550-8185

Ann "Ana" Marie Jordan
State Bar No. 00790748
ajordan@carterarnett.com
Linda R. Stahl
State Bar No.00798525
lstahl@carterarnett.com

**ATTORNEYS FOR JENNIFER THOMPSON**

No. 25-10196

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

JENNIFER THOMPSON,
*Plaintiff-Appellant,*

v.

ACY MCGEHEE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF GODLEY; CITY OF GODLEY, TEXAS; MATTHEW CANTRELL, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS INTERIM POLICE CHIEF OF THE GODLEY POLICE DEPARTMENT; JEREMY ARBUTHNOT, BADGE #980; SPENCER TEMPLER, BADGE #985,
*Defendants-Appellees.*

---

On Appeal from the United States District Court for the
Northern District of Texas, Dallas Division
Civil Action No. 3:23-CV-1441-N

---

## CERTIFICATE OF INTERESTED PERSONS

---

The counsel below certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

## Plaintiff/Appellant

1. Jennifer Thompson

   And her attorneys at:
   **CARTER ARNETT PLLC:**
   Ann "Ana" Marie Jordan
   E. Leon Carter
   Linda R. Stahl

## Defendants/Appellees

1. City of Godley

   And its attorneys at:
   **FANNING HARPER MARTINSON BRANDT & KUTCHIN, PC:**
   Thomas P. Brandt
   Christopher D. Livingston

2. Acy McGehee
3. Matthew Cantrell
4. Jeremy Arbuthnot
5. Spencer Templer

   And their attorneys at:
   **FEE SMITH SHARP & VITULLO LLP:**
   Darrell G-M Noga
   Christopher A. Klement

/s/ *Ann "Ana" Marie Jordan*
Attorney of Record for Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument will aid the Court's decisional process because this case involves complex legal issues involving allegations of First, Fourth, and Fourteenth Amendment violations by a Mayor, Police Chief and law enforcement officers against a former city council member, and the Court's resolution of these issues will depend in part on its understanding of a fact-intensive complaint and record.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................... 2

STATEMENT REGARDING ORAL ARGUMENT ................................. 4

TABLE OF CONTENTS .................................................................. 5

TABLE OF AUTHORITIES ............................................................. 9

JURISDICTIONAL STATEMENT ...................................................14

INTRODUCTION .......................................................................16

STATEMENT OF ISSUES .............................................................18

STATEMENT OF THE CASE .........................................................19

I.    Godley is a Type A General-Law Municipality .............................19

II.   Agenda Procedures Were Established by Custom and Practice ...20

III.  Whistleblower Police Chief's Resignation Ignites
      Divide Among Council Members ......................................................23

      A.    Mayor unlawfully blocks special meeting agenda ...............26

      B.    Papenfuss and Thompson initiate their own
            inquiries into whistleblower allegations .............................27

      C.    Papenfuss and Thompson discuss whistleblower
            allegations in public meeting..............................................29

      D.    Thompson's public statements trigger retaliation
            threat and Administrator's resignation...............................31

IV.   Thompson Adds Items to a Copy of a Meeting Agenda ................33

V.    Mayor Secretly Files Criminal Complaint on City's Behalf .........36

A.    Mayor offers misleading information to police and directs city staff to do the same .................................... 37

B.    District Attorney informs police that no crime was committed when Thompson added her agenda Items .......... 42

C.    County Attorney prompts supplemental investigation which generates no inculpatory evidence ........................................ 44

VI.   City Attorney Resigns and Mayor Schedules Votes to Replace Him and the Secretary ................................................................ 50

A.    Mayor is aware Thompson's absence creates tie votes ......... 52

B.    Police pursue arrest in violation of Department policy ........ 53

C.    False probable cause affidavit is submitted to magistrate ................................................................................ 57

D.    Thompson is arrested minutes before the meeting and held in jail overnight ........................................................ 57

VII.  Thompson Files Suit ................................................................ 60

A.    Defendants move to dismiss under Rule 12(B)(6) ............... 61

B.    Thompson obtains leave to amend her complaint and Defendants refile dismissal motions .................................... 64

C.    Supreme Court decides *Gonzalez* and vacates *Villarreal* ..... 68

D.    The district court erroneously concludes probable cause defeats Thompson's claims ......................................... 69

SUMMARY OF ARGUMENT .................................................... 70

STANDARD OF REVIEW .................................................... 72

ARGUMENT .................................................... 72

I.     Probable Cause was Absent as a Matter of Law ..........................72

II.    The Independent Intermediary Doctrine is Inapplicable
       Because Thompson Sufficiently Alleges a *Franks* Claim..............77

       1.     Statements that Arbuthnot met with Jessica Hill
              on 12/22/2022 and she "is" the City Secretary for the
              City of Godley" and that she advised "she is the only
              one who creates and publishes" the agenda are false.
              ROA.375 [¶2]........................................................................78

       2.     Statement that the secretary had asked Thompson
              whether she had edited the "original City Council
              eeting Agenda document" is knowingly false.
              ROA.375 [¶6].........................................................................80

       3.      Statements that Thompson had "forged" a document
              and "forged" the secretary's signature were knowingly
              false. ROA.375 [¶4-6] ...........................................................81

       4.      Statement that Thompson's "edit" "could have"
              misinformed citizens/city council members was false ..........81

III.   Alternatively, the *Nieves* Exception to the Absence of
       Probable Cause Requirements Applies .........................................85

IV.    The Mayor is a *Monell* Policymaker and His Policy Decision
       is Sufficiently Alleged ...................................................................89

       A.     Within a Type A General-Law Municipality, the Mayor
              is a *Monell* policymaker ........................................................89

       B.     Mayor's choice to punish and suppress First Amendment
              Activity qualifies as a *Monell* Policy.....................................92

       C.     *Lozman* and *Mt. Healthy* control the causation
              analysis related to the Mayor's conduct ...............................95

V.    The Police Chief is Also a Policymaker and his Policy is
      Sufficiently Alleged ........................................................................98

VI.   Absence of Probable Cause is Not Required to Prove a
      Procedural Due Process Claim ....................................................102

VII.  Individual Defendants are Not Entitled to Qualified
      Immunity as a Matter of Law ......................................................104

VIII. *Carswell* Should be Clarified ......................................................105

CONCLUSION ........................................................................................107

CERTIFICATE OF SERVICE .............................................................109

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................110

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................. 72, 78

*Brady v. Maryland*,
  373 U.S. 83 (1963) ........................................................................ 27

*Brown v. Miller*,
  519 F.3d 231 (5th Cir. 2008) ..................................................... 103

*Calhoun v. Ramsey*,
  408 F.3d 375 (7th Cir.2005) ......................................................... 99

*Carswell v. Camp*
  54 F.4th 307, 313 (5th Cir. 2022) ...................................... Passim

*City of Canton, Ohio v. Harris*,
  489 U.S. 378 (1989) ................................................................... 100

*City of Oklahoma City v. Tuttle*,
  471 U.S. 808 (1985) ............................................................... 92, 93

*City of St. Louis v. Praprotnik*,
  485 U.S. 112 (1988) ..................................................................... 90

*Cole v. Carson*,
  802 F.3d 752 (5th Cir. 2015) ............................................. 103, 105

*Constructors Unlimited Inc. v. State*,
  717 S.W.2d 169 (Tex. App.—Houston [1st Dist.] 1986, pet ref'd) .............. 76

*Davidson v. City of Stafford, Texas*,
  848 F.3d 384 (5th Cir. 2017) ....................................................... 73

*Franks v. Delaware*,
  438 U.S. 154 (1978) ............................................................. Passim

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) ...................................................................... 16

*Garza v. City of Donna*,
    922 F.3d 626 (5th Cir. 2019)......................................................... 93

*Gonzalez v. Trevino*,
    602 U.S.653 (2024) ............................................................. Passim

*Hammervold v. Blank,*
    3 F.4th 803 (5th Cir. 2021 ......................................................... 104

*Hernandez v. Sta*te,
    577 S.W.3d 361 (Tex. App—Houston [14th Dist.] 2019) ............................ 76

*Hughes v. Garcia,*
    100 F.4th 611 (5th Cir. 2024) ................................................... 77, 78

*Jackson v. Marion County,*
    66 F.3d 151 (7th Cir.1995) ........................................................... 99

*Jett v. Dallas Indep. Sch. Dist.*,
    491 U.S. 701 (1989) ................................................................... 90

*Keenan v. Tejeda*,
    290 F.3d 252 (5th Cir. 2002).................................................... 85, 105

*Lozman v. City of Riviera Beach*,
    138 S.Ct. 1945 (2018) ......................................................... Passim

*Monell v. Dep't of Soc. Servs. of City of New York*,
    436 U.S. 658 (1978)........................................................... Passim

*Mt. Healthy City Bd. of Ed. v. Doyle, ,*
    492 U.S. 274 (1977) ........................................................... Passim

*Nieves v. Bartlett*
    587 U.S. 391, 398 (2019)..................................................... Passim

*Ortiz v. Werner Enters., Inc*.,
    834 F.3d 760 (7th Cir. 2016)......................................................... 99

*Parker v. Blackwell*,
 23 F.4th 517 (5th Cir. 2022) ........................................................101

*Pembaur v. City of Cincinnati*,
 475 U.S. 469 (1986) ............................................................. Passim

*Pena v. City of Rio Grande City*,
 879 F.3d 613 (5th Cir. 2018) ......................................................101

*Phelan v. Cook Cnty.*,
 463 F.3d 773 (7th Cir. 2006) ...................................................98, 99

*PHI Grp., Inc. v. Zurich Am. Ins. Co.*,
 58 F.4th 838 (5th Cir. 2023) .........................................................72

*Piotrowski v. City of Houston*,
 237 F.3d 567 (5th Cir. 2001) ..................................................92, 102

*Pokladnik v. State*,
 876 S.W.2d 525 (Tex. App.—Dallas 1994) ...................................76

*Porter v. Epps*,
 659 F.3d 440 (5th Cir. 2011) ......................................................104

*St. Maron Properties, LLC v. City of Houston*,
 78 F.4th 754 (5th Cir. 2023) ..................................................93, 102

*State v. Brantner*,
 360 Md. 314 (Md. 2000) .............................................................74

*Terwilliger v. Reyna*,
 4 F.4th 270 (5th Cir. 2021) ....................................................77, 78

*Thompson v. Clark*,
 596 U.S. 36 (2022) ...................................................................105

*United States v. Giglio*,
 405 U.S. 150 (1972) ....................................................................27

*United States v. Isler*,
 36 M.J. 1061 (A.F.C.M.R. 1993) .................................................75

*United States v. McCoy*,
  47 M.J. 653 (1997) ..................................................................................74

*United States v. Williams,*
  1997 WL 335794 (USDC- D.C., June 11,1997) ........................................27

*Valle v.* City *of Houston*,
  613 F.3d 536 (5th Cir. 2010) ...................................................................102

*Villarreal v. City of Laredo, Texas*,
  134 F.4th 273 (5th Cir. 2025) ....................................................................69

*Villarreal v. City of Laredo, Texas*,
  94 F.4th 374 (5th Cir. 2024) .............................................................. Passim

*Webb v. Town of Saint Joseph*,
  925 F.3d 209 (5th Cir. 2019) .....................................................................92

*Wernecke* v. Garcia,
  591 F.3d 386 (5th Cir. 2009) ...................................................................101

## Other Authorities

28 U.S.C. § 1291 ..............................................................................................14

42 U.S.C. §1983 ..................................................................................... Passim

Federal Rule of Appellate Procedure 4(a)(1)(A) ...........................................14

Federal Rule of Civil Procedure 12(b)(6) .............................................. Passim

Federal Rule of Civil Procedure 26(a)(1)(A) ................................................62

Godley City Code § 30.01 ...............................................................................19

Godley City Code § 31.01 ...............................................................................20

Tex. Gov't Code § 311.016(2) ........................................................................26

Tex. Gov't Code § 551.041 .............................................................................20

Tex. Gov't Code § 551.043 (a) ........................................................................20

Tex. Gov't Code § 551.043 (b)(2) ........................................................ 21

Tex. Gov't Code § 551.050(b) ........................................................ 20, 83

Tex. Local Gov't Code § 22.001 ...................................................... 19

Tex. Local Gov't Code § 22.031(b) .................................................. 20

Tex. Local Gov't Code § 22.037 (a) ................................................. 52

Tex. Local Gov't Code § 22.037(c) .................................................. 30

Tex. Local Govt. Code § 22.038(b) .................................................. 26

Tex. Local Govt. Code § 22.038(c) .................................................. 27

Tex. Local Govt. Code § 22.042 ...................................................... 94

Tex. Local Govt. Code § 22.042 (b) ................................................. 91

Tex. Local Govt. Code § 22.042 (e) ................................................. 91

Tex. Local Govt. Code § 22.073 (a) (b)(3) ....................................... 22

Tex. Local Govt. Code § 22.073 (h) ................................................. 21

Tex. Penal Code § 37.01 (2)(A) ...................................................... 73

Tex. Penal Code § 37.10 (a)(1) ................................................. Passim

Tex. Penal Code § 37.10 (c)(1) ...................................................... 37

Tex. Penal Code § 37.10 (f) .......................................................... 82

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because it arises from a final decision of the United States District Court for the Northern District of Texas. Appellant timely appealed under Federal Rule of Appellate Procedure 4(a)(1)(A) by filing her notice of appeal on January 15, 2025 (ROA.1160.) which was within 30 days of the district court's entry of the judgment on January 7, 2025. ROA.1159.

No. 25-10196

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

JENNIFER THOMPSON,
*Plaintiff-Appellant,*

v.

ACY MCGEHEE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS MAYOR OF
THE CITY OF GODLEY; CITY OF GODLEY, TEXAS; MATTHEW CANTRELL,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS INTERIM POLICE CHIEF OF
THE GODLEY POLICE DEPARTMENT; JEREMY ARBUTHNOT, BADGE #980;
SPENCER TEMPLER, BADGE #985,
*Defendants-Appellees.*

---

On Appeal from the United States District Court for the
Northern District of Texas, Dallas Division
Civil Action No. 3:23-CV-1441-N

---

## BRIEF OF APPELLANT JENNIFER THOMPSON

---

TO THE HONORABLE FIFTH CIRCUIT COURT OF APPEALS:

Jennifer Thompson files her opening brief in this appeal from

dismissal of her complaint on motions by the Defendants under Rule

12(b)(6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

"[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." – *Garrison v. Louisiana*, <u>379 U.S. 64, 74-75</u> (1964).

The City of Godley is a small, close-knit community located 30 miles southwest of Fort Worth. It operates under an aldermanic form of government which consists of the Mayor and five Council Members. In 2022, after a whistleblower Police Chief accused high-ranking city officials of wrongdoing, a newly elected City Council Member Jennifer Thompson ("Thompson") used her voice to ferret out corruption and bring change to Godley. Due in part to Thompson's persistent efforts, several high-ranking city officials resigned.

When the time came to fill the vacancies, the Mayor handpicked a slate of replacements to whom a majority of council members, including Thompson, were opposed. On February 7, 2023, when the votes were scheduled, a council majority was poised to defeat the Mayor's appointees. They failed. Not because the Mayor persuaded opposition members to change their votes, but because he directed police to arrest Thompson to guarantee she never made it inside the building. Just before

the meeting began, Thompson was arrested in front of city hall, handcuffed, and transported to jail where she was strip searched and held overnight. Due to Thompson's surprise arrest and forced absence from the dais, the Mayor broke tie votes in his favor and installed his preferred candidates.

What crime did Thompson commit to earn her trip to jail? Was she selling drugs? Did she assault her spouse? No. On December 22, 2022, Thompson added omitted agenda items to a *copy* of a posted meeting agenda and instructed the city secretary to post the corrected copy at city hall. According to the Mayor, this conduct was so egregious, it should punished by criminal prosecution. Without informing city council of his intent to do so, on the city's behalf, the Mayor filed a criminal complaint in support of a felony charge while providing false, incomplete, and misleading information in support.

With knowledge of the information's falsity, police presented a false probable cause affidavit to a magistrate who signed a warrant. Three days after Thompson's arrest the prosecutor refused to prosecute. Following an election, a newly installed city council cast a "no-confidence"

vote against the Mayor based in part on Thompson's arrest. The Mayor subsequently resigned. While change eventually came to Godley, it came at great cost to Thompson.

Thompson's complaint and the record show facts plausibly establishing that the individual decisions to punish Thompson, and whether, when, and how to execute the arrest, which were all directed by the Mayor and implemented by Godley police, were substantially driven by retaliatory animus for Thompson's expressive activity and with intent to suppress her speech. Thompson also plausibly alleges police lacked probable cause to arrest as a matter of law and that they obtained a warrant under false pretenses in violation of *Franks v. Delaware.*

For these reasons and those discussed below, the district court's dismissal of her 42 U.S.C. § 1983 under Rule 12(b)(6) was error and should be reversed.

## STATEMENT OF ISSUES

1.     Whether Thompson plausibly alleged Defendants deprived her of her constitutional rights under the First, Fourth, and Fourteenth Amendments when she was punished and arrested because their

decisions: (a) were substantially motivated by retaliatory animus; (b) were executed with intent to suppress her speech, (c) lacked probable cause, and (d) were based on falsified evidence.

2.      Alternatively, whether Thompson plausibly alleged facts that triggered the *Nieves v. Bartlett* exception to the absence of probable cause requirement in retaliatory arrest cases.

3.      Whether *Carswell v. Camp* authorizes a blanket stay on discovery to excuse municipalities from participating in *written* discovery while the district court considers a motion to dismiss filed by *individual* defendants based on qualified immunity.

## STATEMENT OF THE CASE

### I.      GODLEY IS A TYPE A GENERAL-LAW MUNICIPALITY.

The City of Godley consists of less than 2000 residents and is therefore incorporated as a Type A General-Law Municipality. Godley City Code § 30.01.[1] The City operates under an aldermanic form of government. *See* Tex. Local Gov't Code § 22.001. City Council consists of

---

[1]      The Godley City Code can be found here:
https://codelibrary.amlegal.com/codes/godley/latest/overview

a mayor and five council members. Tex. Local Gov't Code §§ 22.031(b), .035. The City Code required regular council meetings be held every first Monday of each month, unless "otherwise set forth by the Mayor and Council and duly posted notice." Godley City Code § 31.01. However, under a resolution enacted by a majority of city council, regular meetings took place the first Tuesday of each month. ROA.819 [¶18]. In a special election held in May 2022, Thompson was elected for the first time to serve the remaining year of a two-year council term after her predecessor resigned. ROA.820 [¶21]. Her term expired in May 2023.

## II.   AGENDA PROCEDURES WERE ESTABLISHED BY CUSTOM AND PRACTICE.

The Texas Open Meeting Act ("TOMA") requires municipalities to give "notice of the date, hour, place, and subject of each" forthcoming council meeting. Tex. Gov't. Code §551.041. The notice "must be posted in a place readily accessible to the general public at all times for at least 72 hours" before the meeting. *Id.* § 551.043(a). TOMA also provides that a "municipal governmental body *shall post* notice of each meeting on a *physical* or electronic bulletin board at a place convenient to the public *in the city hall.*" Tex. Gov't Code § 551.050(b). TOMA permits publication of

the notice on the internet, but the municipality must still comply with the "duty" imposed to "physically post the notice at a particular location." Tex. Gov't Code § 551.043(b)(2). If these requirements are not met, the meeting cannot occur, or an agenda item omitted from the notice cannot be discussed.

Other than the procedures imposed by TOMA, there were no formal written procedures promulgated by the City of Godly that set forth the duties and responsibilities of city officials or staff related to assembling, posting, or publishing meeting agendas. ROA.820 [¶19]. In 2022, the custom and practice was that the secretary physically posted the agenda at city hall and certified that the agenda was posted in compliance with TOMA[2] ROA.416-17. *See* Tex. Local Gov't. Code § 22.073 (h)("the secretary shall perform all other duties required by law. . . or order of the governing body."). But at times others did so, including the Mayor and City Administrator.[3]

---

[2]      *See* City of Godley, Texas Website, Agenda & Minutes, 2022, located at: https://godleytx.gov/index.asp?SEC=44D2A845-4416-407E-9EF6-DA3FF85CA109&DE=580723EE-B6E4-4DC2-B640-EAEE54456BB3 (last visited on May 28, 2025).

[3]      *See id.* (agendas for Jan. 18, Oct. 4, and Nov. 1, 2022).

Typically the secretary physically posted the final agenda on the last Friday before the regular Tuesday meetings. In 2022, former secretary Stephanie Hodges used handwritten signatures to certify the posting[4] but after Jessica Hill became secretary in May, she mostly used electronic signatures, and only at times used handwritten signatures.[5] All meeting notices were physically posted on a public bulletin board protected by a locked glass case located outside the building on the front steps of city hall. Once an agenda was physically posted, the public had viewing access to it 24 hours a day—even if city hall was closed. Meeting minutes were drafted by the secretary and signed by the Mayor and secretary. ROA.417. Original agendas and meeting minutes were kept by the City Secretary for information purposes pursuant to state law. Tex. Local Gov't Code §22.073 (a), (b)(3).

Before November 1, 2022, however, agenda items had been submitted only by city staff, not council members. *See* fn.2 (agendas Jan-Nov. 2022). During Thompson's short tenure she believed state law

---

[4]    *See id.* (agendas for Feb. 1, 15; Mar.15; Apr. 5,19).
[5]    *See id.* (agendas for May 3, Jul.19, Nov. 1 signed by hand) (agendas for May 17, Jul 5, Aug.16, Sept.6, Sept.20, Dec. 12, Dec. 27 electronically signed).

authorized council members to add agenda items without limit so long as they were posted within the TOMA deadline, and that state law did not require that they first seek "approval" or "permission" from either the Mayor or the secretary before adding or removing their own items. Beginning in November 2022, Thompson and two other council members began adding their own items to the agenda.

## III. WHISTLEBLOWER POLICE CHIEF'S RESIGNATION IGNITES DIVIDE AMONG COUNCIL MEMBERS.

After Thompson's election, citizens expressed concern they were being targeted by police after voicing opinions during city council meetings.[6] ROA.821[¶23]. In November 2022, Police Chief Jason Jordan confessed that at the direction of city officials police were targeting and retaliating against citizens for their speech. ROA.820[¶23],822[¶¶28-32].

On November 1, 2022, during a council meeting, Chief Jordan tendered his resignation and distributed a blue folder to each council member without publicly disclosing their contents. ROA.411, 821-22

---

[6]     *See* ROA.422 [(Nov. 18, 2022 meeting agenda documenting concern by city council member that the city targets citizens who voice their opinion)], 425 [Dec. 6, 2022 meeting minutes referencing report by citizen that city officials told police to "target her family"].

[¶¶27-29]. These folders contained information implicating city officials and police officers Matthew Cantrell, Jeremy Arbuthnot, and Solomon Omotoya in wrongdoing. ROA.820[¶23], 822[¶29]. Chief Jordan also implicated himself by confessing that at the direction of City Administrator he had targeted citizens who spoke out at council meetings to "disparage" them. ROA.821[¶23], 822[¶¶29-31]. Chief Jordan believed he himself was targeted for retaliation by the City Administrator for statements he made in a meeting. ROA.820[¶22], 822[¶31].

The long standing custom in Godley was that the City Administrator made the hiring and firing decisions for the Police Department and Department policy was determined by the Chief of Police. ROA.819 [¶¶16-17]. Indeed, these customs were codified in the Godley Police Department General Orders, which provided: "[t]he chief of police and all officers of the department are appointed and serve at the will and pleasure of the city manager" [7] (ROA.479 [I(B)].), and "[a] policy

---

[7]    On July 16, 2024, the Godley City Code was amended to remove the Administrator's influence over hiring and firing within the Police Department and to "give the Chief of Police full authority over the City's Police Department." *See* Godley City Ordinance No. 07-2024-120, located at:

is a statement of the department's philosophy on a given issue. Department Policy is determined by the Chief of Police." ROA.475 [II(A)].

The contents of these folders revealed to the council for the first time that Officer Omotoya had accused Jordan of racial discrimination, which Jordan denied. ROA.821 [¶¶24-26]. According to Jordan he chose to resign rather than participate in an investigation run by the City Administrator because he believed the results of the investigation would be rigged against him. ROA.820-21 [¶¶22-24].

Without being apprised of any of these facts, city council members were asked by the City Attorney and City Administrator to accept Jordan's resignation, approve the separation agreement, and approve Sergeant Cantrell's appointment to Interim Police Chief. ROA.415 [items C, D], 822-23 [¶32]. Since council was unaware of the contents of Jordan's folders, a majority of city council voted to approve these actions. ROA.415 [items C,D], 822 [¶¶32-33]. However, even before Thompson became

---

https://godleytx.gov/index.asp?SEC=372E8621-D15C-4829-8B23-6DD441CFF11E (last visited May 30, 2025).

aware of Jordan's accusations against Cantrell, Thompson opposed Cantrell's appointment. ROA.823 [¶33].

### A. MAYOR UNLAWFULLY BLOCKS SPECIAL MEETING AGENDA.

Special meetings can be called by a majority of city council and when this happens, state law provides that the Mayor "*shall*" call and notice the special city council meeting.[8] Tex. Local Govt. Code 22.038(b); ROA.824 [¶36]. After reviewing the allegations contained in Jordan's blue folders, Council Members Michael Papenfuss, Thompson, and Roger Cornelison called for a special meeting to occur on November 18, 2022 to discuss the allegations. ROA.418-22, 823 [¶¶34-35]. For the first time since Thompson was elected in May, each council member assembled their own agenda items and submitted them to the secretary for posting at city hall in time to comply with TOMA. ROA.418-23, 823 [¶¶34-35].

After receiving these agenda items, the agenda was not posted. ROA.423. Two council members aligned with Mayor refused to appear at the special meeting, breaking quorum, for which the Mayor could have,

---

[8]    The Texas Legislature has explained in the Code Construction Act that the word "shall" "imposes a duty." Tex. Gov't Code § 311.016(2).

but did not punish them. ROA.824 [¶¶37-38]. *See* Tex. Local Govt' Code § 22.038(c). Discussion about these serious issues of public concern was therefore delayed until the next regular meeting scheduled for Tuesday, December 6, 2022.

## B.  PAPENFUSS AND THOMPSON INITIATE THEIR OWN INQUIRIES INTO WHISTLEBLOWER ALLEGATIONS.

Meanwhile, before the December 6, 2022 meeting, Council Member Michael Papenfuss inquired about Jordan's allegations related to police misconduct. ROA.824-25 [¶¶39-40]. Among Jordan's allegations was that Officer Omotoya was on a "Brady" list.[9] ROA.419 [item "A"], 422 [first full sentence], 434-35 [item "R"], 824-25 [¶40]. Before any action could be taken on this and other police matters, however, Papenfuss was side-lined by an accusation of harassment launched by officers Arbuthnot and

---

[9]     *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny imposes a duty on the government to disclose material exculpatory evidence to the defense. The *Brady* duty includes disclosing evidence that could be used to impeach government witnesses, including police officers. *See United States  v. Giglio*, 405 U.S. 150 (1972). Examples of exculpatory evidence include making prior inconsistent statements, filing false reports, and misconduct involving untruthfulness. *See eg. United States v. Williams* 1997 WL 335794 (USDC- D.C., June 11,1997). If an officer has been placed on a *Brady* List, it means the officer had incidents of untruthfulness that were sustained, which may place their credibility into question. In every case the officer testifies, prosecutors are required to review the information and determine on a case by case basis whether it meets the *Brady* disclosure requirements. *See Williams* at *2.

Omotoya just before the December 6 meeting. ROA.429-30 [items "C","D"], 825 [¶¶41-42], 826 [¶45]. These accusations arose from a single statement Papenfuss made in jest two months earlier in front of a large group that included these officers. ROA.825 [¶¶42-44]. The City Attorney immediately added the allegations to the December 6 agenda and discussed them in open session. ROA.429-30 [items C, D].[10]

Thompson initiated her own inquiries into Jordan's allegations about the City Administrator. ROA.824 [¶39], 826 [¶¶47-49]. Thompson submitted to city staff several requests for information, which were ignored. ROA.826 [¶¶47-49]. Among them was a request for an asset inventory list. ROA.827[¶51]. This request was tied to an allegation that the City Administrator had transferred title to a city fire truck to his friend rather than auction it off as required by state law. ROA.826 [¶48]. Thompson's request for the asset inventory list and other information highlighted her intent to run to ground this and other allegations and to

---

[10]    Although the agenda was purportedly posted at city hall on December 2, 2022, the posting certificate in the meeting minutes was *un*signed. ROA.440. Nor does a signed copy appear on the City's website.

implement policies and procedures to better manage and track city assets going forward. ROA.826[¶48].

### C. PAPENFUSS AND THOMPSON DISCUSS WHISTLEBLOWER ALLEGATIONS IN PUBLIC MEETING.

The December 6 meeting began at 5:00 p.m. and adjourned at 11:21 p.m. ROA.440. The meeting opened with citizens thanking Thompson, Papenfuss, and Cornelison and encouraging them to continue their efforts to bring transparency and accountability to Godley.[11] ROA.425. Citizens also criticized the Mayor and his two council allies for not being committed to transparency. *See infra*, fn.11.

During the meeting, Thompson pointed out that the minutes from the November 1, 2022 meeting *falsely* reflected that she had voted *for* Cantrell's appointment.[12] ROA.427 [item "H"], 827 [¶52]. Thompson reminded the Mayor that she had *opposed* Cantrell's appointment. ROA.827 [¶52]. The city council voted to amend the minutes and were adopted with this change. ROA.427 [item H]. Though the entry in the

---

[11] *See* Video of Godley City Council Meeting, Dec. 6, 2022, located at https://www.youtube.com/watch?v=CNPJ8zkadd4 (@ 8:23-15:47,last visited 5/26/25).
[12] *See id*. @ 21:01-24:27 (last accessed on May 25, 2025).

government document was false, no one was charged, investigated, or arrested for tampering with a government record.

At this meeting, Thompson also expressed her preference to remove Cantrell from the position of interim chief and to publicly post the position of Police Chief so city council could consider other options. ROA.437 [item "CC"], 445 [item "Q"], 827 [¶52]. Thompson publicly disclosed her requests for information were being ignored with impunity. ROA.826-27 [¶49]. Thompson also publicly raised questions about the City Administrator hiring his father to service police vehicles without going through a procurement process and without requiring liability insurance. ROA.827 [¶51]. The City Administrator was forced to publicly confirm this to be true.[13] ROA.434-35 [item "R"].

Papenfuss moved to elect a Mayor Pro Tempore. ROA.435-36 [item "U"]. State law requires the election of a Mayor Pro Tempore, who is authorized to act if the Mayor is unable or refuses to act. *See* Tex. Local Gov't Code §22.037(c). Thompson nominated Papenfuss. ROA.833 [¶71]. Papenfuss was elected by three votes--Thompson, Papenfuss, and

---

[13] *See id*. @ 04:06 (last accessed on May 25, 2025).

Cornelison. ROA.435-36 [item "U"].    Papenfuss and Thompson also
expressed the need to promulgate and implement "processes and
procedures" pertaining to the preparation of the council agenda, which
did not exist. ROA.433-34 [item "P"].] This was proposed in part because
of the failure to post the council member agenda items in November.

    When the harassment accusations launched by officers Arbuthnot
and Omotoya against Papenfuss were being discussed in open session,
Thompson publicly doubted their validity citing in part the two-month
delay in reporting the alleged harassment. ROA.827 [¶50]. She said she
believed the accusations were "organized." ROA.827 [¶50]. And she
expressed concern that they were launched in retaliation for Papenfuss's
recent and ongoing inquiries into police matters. ROA.827 [¶50].

    Because there was much to discuss, the meeting ran long into the
night so many agenda items were carried over to the next special meeting
scheduled for December 12. ROA.828-29 [¶56].

### D. THOMPSON'S PUBLIC STATEMENTS TRIGGER RETALIATION THREAT AND ADMINISTRATOR'S RESIGNATION.

After the December 6 meeting, Thompson was summoned to the
police department by Interim Chief Cantrell. ROA.828 [¶53]. She was

greeted by Cantrell, Arbuthnot, and Omotoya. ROA.828 [¶¶53-54].
During that meeting the trio made statements to the effect that
Thompson should stop making public statements that insinuated city
officials and police officers were engaged in wrongdoing. ROA.828 [¶54].
And if she did not stop, there would be consequences. ROA.828 [¶54].
Thompson interpreted this conversation as a threat of retaliation for her
expressive activity. ROA.828 [¶54]. But she did not let that deter her.

On Friday, December 9, 2022, the secretary posted the agenda for
the special called meeting scheduled for Monday, December 12. ROA.447.
Thompson did not withdraw any of the tabled items that were carried
over from the December 6 meeting. ROA.444 [items D-Z]. These items
reflected Thompson's intent to continue her inquiries, despite the threat
of retaliation. ROA.444. Rather than produce information and answer
any more questions, the City Administrator tendered his resignation to
the Mayor on December 10, and did not appear at the December 12
meeting. ROA.828-29 [¶¶56-59].

In addition, at the December 12 meeting, Thompson informed the
Mayor, City Attorney, and rest of City Council that she believed Godley

police had threatened her with retaliation. ROA.828 [¶55]. At the City

Attorney's suggestion, Thompson sent to the Mayor and City Attorney

written complaints. ROA.828 [¶55]. They took no action except to send

copies of the complaints to the individual officers on December 24, 2022.

ROA.828 [¶55]. After Thompson informed the City Attorney of her intent

to discuss these formal complaints at the January 3, 2023 meeting, the

City Attorney advised her the issue was "not ripe." ROA.471. At the time

of this exchange, the City Attorney knew that Cantrell and Arbuthnot

had been conducting a criminal investigation against her, but he did not

disclose that to Thompson.

Due to the administrator's failure to produce information, council

again voted to carry agenda items to the next special meeting scheduled

for Tuesday, December 27. ROA.444-45, 829 [¶59]. In the wake of the

City Administrator's resignation, the City Secretary was now responsible

for producing the requested information at the next meeting.

**IV.  THOMPSON ADDS ITEMS TO A COPY OF A MEETING AGENDA.**

On Thursday, December 22  the secretary circulated via email to all

council members, the Mayor, and City Attorney a "working agenda."

ROA.361-62, 830-31 [¶¶62-63]. The working agenda omitted all of
Thompson's items carried over from the December 12 meeting, even
though the secretary had on previous occasions automatically carried
them over herself. ROA.361, 831 [¶65]. Consequently, Thompson
immediately emailed the secretary reminding her to add those items.
ROA.361, 831 [¶¶65-66].

In a delayed response, after speaking with the Mayor, the secretary
claimed she did not know which items were carried over. ROA.361, 831-
32 [¶¶63-67]. In reply, Thompson indicated she would send the list
"shortly." ROA.361, 364. But before Thompson could send the list, the
secretary emailed to each member a *copy* of a final agenda that omitted
the carried over items. ROA.342-345, 363. The copy contained a posting
certificate electronically signed by the secretary indicating the agenda
was physically posted at city hall "by 6:00 p.m." ROA.345. Around 5:30
p.m., Thompson received her personal copy of this agenda. ROA.365.

In a rush to meet the 6:00 p.m. posting time, while using her private
computer, Thompson added agenda items to her personal copy of the
agenda. ROA.348. These items included those that were carried-over

from the previous meeting plus two more she intended to discuss at the forthcoming meeting. ROA.364. Thompson then emailed the revised copy to the secretary with instructions to post the attached "updated agenda." ROA.369, 832-33 [¶69]. Thompson simultaneously copied Mayor Pro Tem Papenfuss on this email to make him aware she had timely submitted her agenda items for posting. ROA.384, 833 [¶71]. Although the secretary received Thompson's agenda items in time to post them at city hall, she refused in violation of her ministerial duty to do so. ROA.833-34 [¶¶72-74].

Mayor Pro Tem Papenfuss later published on his Facebook page the corrected version of the agenda. ROA.375 [¶4], 834-35 [¶¶75-77]. Papenfuss did so without Thompson's knowledge and without receiving confirmation from the secretary that she had posted it. ROA.834-35 [¶¶75-77]. Not having received the updated agenda from the secretary herself, he should have, but did not, inspect the bulletin board to ensure it was posted before he published it. Papenfuss removed the unposted agenda from his Facebook page and publicly explained that its publication was his mistake. ROA.835 [¶77]. At all times, the original

agenda, which contained the secretary's electronic signature, remained posted at city hall without alteration. ROA.334 [2d full¶]. Meanwhile, Thompson reported to the Mayor and City Attorney, that the secretary's refusal to post her agenda items was a dereliction of the secretary's ministerial duty, and that she believed the secretary was being instructed not to post them by city officials, which was a "misuse of power and/or authority." ROA.348 [items N, O], 834 [¶74]. The Mayor took no action to remedy the deficiency with the agenda. And through her agenda items, Thompson confirmed she would raise the issue at a council meeting at the next opportunity.

The December 27 special called meeting did not occur because the Mayor and his two allies again broke quorum by failing to appear in violation of state law without consequence. ROA.837 [¶83].

## V.    MAYOR SECRETLY FILES CRIMINAL COMPLAINT ON CITY'S BEHALF.

On December 27, without notifying city council of his intent to do so. ROA.837[¶84], 845 [¶113]. The Mayor filed a criminal complaint against Thompson on behalf of the City of Godley. ROA.340 [identifying the "City of Godley" as "complainant"], 837 [¶84].

A. MAYOR OFFERS MISLEADING INFORMATION TO POLICE AND
DIRECTS CITY STAFF TO DO THE SAME.

Officer Spencer Templer initiated the investigation into a felony
tampering with a governmental record case. ROA.330. His report, which
is titled "forgery," is dated December 27, 2022. This report cites section
37.10(c)(1) of the Texas Penal Code, which makes tampering with a
governmental record a state jail felony if " the actor's intent is to defraud
or harm another." ROA.330.

In support of the criminal complaint, the Mayor submitted a
written statement and directed the secretary to give one as well.
ROA.336-38, 836 [¶79], 838 [¶88]. In his statement the Mayor wrote: "to
*my knowledge and understanding* [the secretary] is responsible for
assembling items for council agendas for the City of Godley council
meetings." ROA.338. While this statement may not be demonstrably false
on its face because it is based on the Mayor's *subjective* belief, it is
deliberately ambiguous and is therefore misleading because it omits
critical facts known to the Mayor that if shared would have caused a
reasonable person to question whether a crime had been committed.

For example, the Mayor was aware of, but omitted, the facts that
(1) the secretary circulates *copies* of agendas after the original agenda is
physically posted at city hall and the City only keeps the *originals* for
information purposes; (2) on three previous and recent occasions, council
members added their own items to the agenda, demonstrating Thompson
could have reasonably believed she *shared* in the responsibility of
assembling items for council agendas (ROA.411-467.); (3) publishing on
Facebook an agenda that was not physically posted at city hall would
have no *legal effect* on the topics discussed at the council meeting,
demonstrating Thompson had no motive to cause the corrected agenda to
be published on *Facebook*; (4) the secretary's omission of items council
had carried over from a previous meeting rendered the agenda that was
posted at city hall incomplete and therefore incorrect, and that posting
Thompson's corrected copy would have timely corrected the deficiency;
and (5) city council had not adopted any formal written rules or
procedures codifying the Mayor's subjective belief about the secretary's
and Thompson's roles and duties when it came to the agenda. If these
facts were included, a reasonably prudent person would have questioned

whether the Mayor's *subjective* belief was sufficient to support the conclusion that Thompson, an elected city council member with the right to speak about agenda items at city council meetings, had committed a crime.

Next, the City Secretary wrote in her statement the following:

Once the agenda items were received, I posted the agenda. Mrs. Thompson had not been clear on exactly what she wanted to have added and got upset that her items were not included in the final agenda. She updated the document to include her items and asked me to repost it, to which I did not.

She ended up driving up to city hall where I asked her if she edited my document and she said "yes." And she stated she had talked to TML and they said she could. . . . I did not in anyway give Ms. Thompson the permission to update the final agenda. Nor did I give her permission to use my signature on the document she sent to me that included her additions.

ROA.336. As demonstrated *infra*, none of these statements support the elements of tampering with a government record because it is undisputed that the "document" to which the secretary refers was Thompson's *personal copy*, not the *original*. And the original was the only **official** document, which had remained posted at all times at city hall— **unaltered**. These statements also establish that Thompson's entries

were true, not false, because they confirm Thompson intended to discuss these topics at a *future* meeting.

In addition to their written statements, both the secretary and the Mayor offered verbal statements to police. According to Templer's police report the secretary advised him that "the mayor's executive decision supersedes that of the city council's decision." ROA.333 [3d¶last sentence]. Not only is this false as a matter of law, but it reflected the Mayor's belief that he had unilateral authority to overrule city council action. This was another area of disagreement between the Mayor and Thompson. And which Thompson planned to address at the next meeting, as reflected in her list of agenda items ROA.348 [items N,O], 831 [¶63-64]. Consistent with state law Thompson believed that when the city council acted, its actions could only be overridden by collective action of the majority of city council, not the Mayor.

The secretary also made these additional oral statements:

Ms Hill stated she was concerned about the additional discussion topics Ms. Thompson added to her document because she believes Ms. Thompson is upset with her for not adding her items to the agenda list. Ms. Hill stated she is specifically concerned with item "O," which is a discussion and

> possible action concerning subordination.  Ms. Hill states she
> believes this discussion is in reference to her.

ROA.334 [3d full¶].  These statements establish the secretary was concerned that her refusal to perform her ministerial duty would be publicly disclosed, which might result in legal consequences. Templer also documented the Mayor's oral statement that he "did not **approve** of any recent City Council Meeting Agenda," which implied Thompson was required to obtain the Mayor's permission to add items to the agenda, which she did not believe was required. ROA.334 [3d¶].

Templer also documented he had physically confirmed "**the official** City Council Meeting Agenda, *which is located at the bulletin board at City Hall,* does not include any of Ms. Thompson's additional entries." ROA.334 [2d full ¶]. Templer was therefore aware that the **official and original** document that the City must keep for information purposes was **unaltered**.

Templer also thought it important to "note" that even though Papenfuss received a copy of "the official City Council Meeting Agenda from Ms. Hill," Templer "did not observe Ms. Hill's official agenda on Mr. Papenfuss's Facebook page." ROA.334 [last two sentences]. Thus, this

establishes Templer believed the fact that the secretary had not sent to Papenfuss a copy of the "updated" agenda herself, proved that Papenfuss was aware the corrected agenda was not a copy of the "official" agenda before he published it. Consequently, when assessing Papenfuss's criminal intent, it would not matter when or how he received the corrected agenda, because it was undisputed *the secretary* never sent a copy of it to him.

Finally, Templer authored an *undated* report for the tampering charge. ROA.351-55. But this report did not contain additional information, it merely copied verbatim the information included in Templer's "forgery" report generated on the criminal justice database. ROA.333-35, 351-55.

## B. DISTRICT ATTORNEY INFORMS POLICE THAT NO CRIME WAS COMMITTED WHEN THOMPSON ADDED HER AGENDA ITEMS.

The Department's General Orders set forth a formal procedure instructing police that "during any investigation (or during planning for arrest or pretrial stages), any questions of law or criminal procedure shall be addressed to the district attorney." ROA. 521 [GO 7.4 (IX)(C)], 846-47 [¶120]. With Templer's report in hand, the Interim Police Chief

approached the District Attorney's Office about obtaining an arrest warrant for a *felony offense* against both Thompson and Papenfuss. ROA.330, 838 [¶¶88-9].

When Sergeant Arbuthnot presented the facts known to the police to the Johnson County District Attorney's office, he was advised by the Assistant District Attorney (ADA) that no crime was committed. ROA.839 [¶90]. The ADA concluded Thompson could not have tampered with the document and that criminal intent was negated. ROA.839 [¶90]. The ADA explained, as a city council member, Thompson was authorized to add items to a meeting agenda, and that the back-and-forth emails between the secretary and Thompson demonstrated Thompson made changes to her personal *copy*, not the *original* agenda document. The ADA also explained that the fact that Thompson instructed the secretary to repost an "updated" agenda to comply with TOMA showed Thompson's intent was to comply with state law not violate it, thereby *negating* criminal intent.

Following his discussion with the ADA, Arbuthnot informed the Interim Police Chief Cantrell and the Mayor that the ADA advised no

crime was committed. ROA.839 [¶91]. The Mayor refused to accept this legal determination, and instructed the Interim Chief to approach the County Attorney about how to obtain a misdemeanor arrest warrant, even though Department policy instructed that the District Attorney was the exclusive authority for questions of law "during any investigation (or during planning for arrest or pretrial stages)."

### C. COUNTY ATTORNEY PROMPTS SUPPLEMENTAL INVESTIGATION WHICH GENERATES NO INCULPATORY EVIDENCE.

At the direction of the Mayor, police regrouped and approached the Johnson County Attorney's Office. ROA.[¶101]. When they did so, they did not disclose that the District Attorney's Office had advised them no crime was committed. Nor did they inform the assistant county attorney (ACA) that Thompson had pending retaliation complaints against the lead investigator Arbuthnot and Interim Police Chief Cantrell. ROA.845 [¶114]. And to ensure that the Mayor's directive to obtain an arrest warrant was implemented, these officers repackaged the evidence that was submitted to the DA, and submitted false and misleading information to the ACA.

Officer Arbuthnot rewrote Templer's original report as a "supplemental report." ROA.356-59. When he did so, Arbuthnot removed Templer's reference to the fact that Arbuthnot reported a "deficiency" in the meeting agenda, not the secretary. *Compare* ROA.333 [1st¶], 358 [1st¶]. Arbuthnot then wrote that the secretary had "related" that Thompson had "*forged*" the agenda document and that Papenfuss had "posted" the "false" and "*tampered with*" agenda document. ROA.358 [1st¶]. These statements were false. The secretary had *not* reported to police that these offenses were committed. In truth, the secretary had merely responded to questions posed by the officers, who were later advised by the ADA that her answers did not amount to criminal offenses because the emails demonstrated Thompson added the agenda items to a *copy*, not the *original* agenda document.

Arbuthnot also wrote that the secretary *told* him that she never gave Thompson "permission to update the ***official Agenda document***." ROA.358 [4th¶]. This was knowingly false and misleading because he added the word "official" and "document" even though the secretary omitted these words. And Templer's report confirmed that the "***official***

Agenda document" that the City was required to keep for information purposes remained unaltered and posted at city hall. ROA.334[2nd full¶].

Arbuthnot further stated, he had emails that showed "the *only authentic* final agenda that was produced by [the secretary]" was sent to Thompson and Papenfuss, when in truth they were each sent *copies* of the final agenda, and the "only authentic" agenda remained posted unaltered at city hall. Arbuthnot also repeatedly made reference to the secretary's "forged signature" without explaining that the original *official* document contained an *electronic signature*, not a handwritten one, and that it was therefore impossible to distinguish between an "original" and a "forged" electronic signature. ROA.359 [three paragraphs that begin "At 1723, "Jessica sent" and "I then"]. Finally, Arbuthnot clarified the Mayor's ambiguous written statement by stating that the Mayor verbally confirmed that the secretary "was the *only* one who can *post* and do the agenda *to his understanding*" but was careful to qualify it. ROA.359.

After speaking to the investigators, the ACA was skeptical so she suggested police obtain more information. ROA.842 [¶101]. In response, police conducted a supplemental investigation on December 28-29, which

was documented in a second supplemental police report written by Arbuthnot and dated January 1, 2023. ROA.370-71. This supplemental investigation generated no inculpatory information.

For example, although excluded from the supplemental report, the ACA instructed police to obtain and review "the written rules/policies/procedures that the city has with regard to who is responsible for creating and posting the agendas." ROA.842 [¶102]. After searching for this information, police found none. ROA.842-43 [¶103]. Even if these officers had been previously unaware—because the Mayor did not tell them—that the city council had not promulgated a formal policy or procedure with respect to creating and posting agendas, they became aware of it after the ACA made them look for one. The absence of a city ordinance proscribing written procedures for creating and posting agendas made it much more likely that the incident arose from a good-faith belief by Thompson about her duties and authority that differed from the Mayor's subjective belief. The absence of these written rules would have caused a reasonably prudent person to question whether a crime was committed.

The ACA also suggested to police that they obtain a statement from Papenfuss, who was the only council member who posted the corrected agenda on his Facebook page. ROA.371, 842 [¶102]. This was likely requested to confirm the Mayor's statement that "to the best of his knowledge" the secretary was "the *only* one who can post and do the agenda." ROA.359 [last¶]. Even though Arbuthnot's harassment complaint against Papenfuss was still pending, he did not delegate the task of obtaining the statement to another officer who had no direct conflict. ROA.371. Instead, Arbuthnot reached out to Papenfuss himself without notifying him he wanted to discuss the December 27 agenda, and deliberately introduced an obstacle that would make it unlikely Papenfuss would provide the statement. ROA.371.

If Papenfuss had been provided with a reasonable opportunity to provide a statement, he would have explained the secretary posts the agenda and certifies *when* the *official* agenda is posted at city hall, which remains posted at all times until it is taken down by the secretary, who keeps the original physically posted agenda for information purposes. ROA.845 [¶¶115-16]. Papenfuss would have also explained that an

48

agenda that is not posted *at city hall* has no legal effect on the items discussed at the meeting. Papenfuss would have stated that the secretary is not the only one authorized to *publish* the agenda. And *publishing on Facebook* a copy of an unposted agenda likewise had no legal effect on the meeting. Papenfuss would have also explained Thompson did not prompt Papenfuss to publish the corrected copy, and that he had been copied on the email Thompson sent to the secretary directing her to post it. ROA.384, 846 [¶¶117-18]. Papenfuss would have further explained he published the corrected copy without first confirming the secretary had posted it at city hall. And he assumed, like Thompson, the secretary would perform her ministerial duty to post it. ROA.845 [¶116]. Neither Thompson nor Papenfuss ever refused to provide information about the agenda to anyone. ROA.845 [¶113]. They were never notified that an investigation was ongoing. If they had known, they would have given statements. Following this supplemental investigation that uncovered no inculpatory evidence, no further reports were authored until after Thompson was arrested on February 7, 2023, and the post-arrest supplemental report made no reference to communications to or from the

ACA after Arbuthnot wrote the January 1, 2023 report. ROA.372-73. Based on the fact that the same ACA rejected the criminal case three days following Thompson's arrest, upon information and belief, the ACA advised these officers they should ***not*** go forward.

## VI.   CITY ATTORNEY RESIGNS AND MAYOR SCHEDULES VOTES TO REPLACE HIM AND THE SECRETARY.

At the January 3, 2023 council meeting, Thompson and the Mayor battled over Cantrell's appointment. ROA.470.[14]  And after Thompson pushed for a financial forensic audit, which the Mayor opposed, ROA.470.[15] the City Attorney, who was aligned with the Mayor, argued with Thompson about an agenda item and criticized her for seeking information about city business. ROA.851 [¶¶135-36].[16] He left the meeting early, and resigned on January 6, 2023. ROA.468, 851 [¶136].[17]

---

[14]   *See*   https://rumble.com/v24hd0y-city-of-godley-january-3rd-2023-city-council-meeting.html @ (44:20 - 46:06), (1:20:47 – 1:24:20)(last visited on May 23, 2025).

[15]   *Id.* at (2:11:26 - 2:18:30).

[16]   *Id.* (begin at 1:51:50), (2:04:17 – 2:08:16). The City Attorney's criticism was that the city lacked staff to respond to Thompson's public information requests, while failing to acknowledge that responding to requests for public information was *his* job.

[17]   Shortly before his resignation, the City Attorney was heavily involved in the criminal investigation against Thompson despite the conflict it created. ROA.839-42

The Mayor did not immediately inform the city council of the City Attorney's resignation. ROA.851 [¶137]. Without consulting the council, and before disclosing the fact that the City Attorney had resigned, the Mayor quickly found and hired a replacement. The Mayor intended to schedule a vote to approve his City Attorney pick on February 7, 2023. ROA.461 [item A], 851 [¶¶137-38], 852 [¶¶140-42]. Shortly after the new interim city attorney was hired, Thompson by chance discovered that the City Attorney had resigned and that Mayor had hired his replacement. ROA.852 [¶140]. When a majority of council learned of the Mayor's actions, they did not approve.

A cease and desist letter was sent to the newly hired City Attorney. ROA.472 [topic 3 referencing cease and desist letter to interim city attorney]. And on February 1, 2023, Thompson submitted agenda items informing the Mayor she intended to vote against his City Attorney appointee, and that she would move the council to appoint an alternative

---

[¶¶92-100]. At this time, Thompson was unaware the City Attorney had obtained copies of email exchanges between Thompson and a Texas Municipal League attorney in which she expressed concern that the City Attorney himself was engaged in wrongdoing and inquired how the city council could legally remove him.

candidate. ROA.472 [topic 3 referencing alternate interim city attorney].
In addition to replacing the City Attorney, the Mayor intended to install
his choice for City Secretary, a position a majority of city council members
wanted to publicly post. ROA.461 [item B], 472 [topic 9]. The Mayor was
aware, that he therefore did not have the votes to install his appointees,
but he saw a path through which he could declare victory.

###    A.    MAYOR IS AWARE THOMPSON'S ABSENCE WOULD CREATE TIE VOTES.

In an aldermanic form of government, the Mayor does not vote in
city council meetings **unless** a city council member is absent or abstains
and his vote is needed to break a tie. Tex. Local Gov't Code § 22.037 (a).
The Mayor was aware that two city council members were aligned with
him, but that Thompson, Papenfuss and Cornelison were not. Thus, if
Thompson was permitted to voice her opposition at the February 7, 2022
meeting, his appointees would surely be defeated. But, if Thompson's
absence could be procured, tie votes would be created that would allow
him to vote for his political appointees.

For this reason, the Mayor had motive and opportunity to direct the
Interim Police Chief Cantrell to "get it done" and ensure Thompson was

arrested before the meeting. ROA.852 [¶142].Cantrell would benefit from suppression of Thompson's opposition because he was the Mayor's choice for Police Chief. And both the Mayor, who was a former police officer himself, and the Interim Police Chief understood that if they could get a magistrate to issue a warrant, Thompson's vote would be eliminated and their true motives would be obscured. For this purpose, Cantrell directed Arbuthnot to prompt the ACA to review before the meeting Arbuthnot's probable cause affidavit, which contained false and misleading information, to ensure the magistrate signed the warrant before the meeting. ROA.853[¶143]. Moreover, all this energy and focus devoted to obtaining *this* arrest warrant for *this* nonviolent misdemeanor was also done in direct violation of Department policy, which instructed police to exercise discretion *not* to arrest under these circumstances.

## B.   POLICE PURSUE ARREST IN VIOLATION OF DEPARTMENT POLICY.

Department policy and custom instructed police to exercise discretion *not* to arrest under the circumstances existing here. General Order 7.40 (IX)(C) provided that in relation to warrants "[q]uestions on law enforcement procedure shall be addressed to the Chief of Police" and

that "in the event a conflict exists between these orders and the City Policy or state law this order will apply where it is more restrictive." ROA.475-76 [General Order 1.1 (III)(C)(4)], 847 [¶120].

General Order 7.1 "set forth guidelines concerning the use of discretion by officers, and [defined] the authority, guidelines and circumstances when officers should exercise alternatives to arrests… ." ROA.491 [(II)], 847 [¶121]. And cautioned when making decision to arrest with or without an warrant, that "an arrest is the most serious action an officer can undertake" and officers therefore "shall consider alternatives to arrest." ROA.496 [General Order 7.3 (I)], 847 [¶121].

Department policy instructed in part that when exercising discretion to arrest:

1. Officers are required to arrest suspects for all felony offense and those major misdemeanor offenses where a victim is injured, property was stolen or damaged, or the public or an individual was placed at risk of great harm.

[. . .]

2. In misdemeanor criminal cases, where there is no victim or property loss, where an individual or the public was not placed in danger of great harm, and in traffic offenses, officers may occasionally be faced with situations where formal action is not advisable. In such cases, officers may elect to exercise alternative

such as the issuance of citations, referral to a social service agency, or simply to give a warning.

[. . .]

5. The use of warnings may sometimes provide a solution to a problem and may enhance the public perception of the department. Normally, the use of a warning occurs in traffic offenses, but occasionally may be applied to criminal offenses. In determining if a warning should be issued, the officer shall consider:

    a. The seriousness of the offense.
    b. Whether a victim was injured or had property damaged by the offender.
    c. Attempt to understand the contributing factors to the incident and evaluate whether a reasonable person would be influenced by those factors.
    d. The likelihood that the violator will heed the warning.

ROA.492-94 [GO 7.1(IV)(C)(1, 2, 5(a-d)].  GPD General Orders further cautioned that "[t]he vast majority of persons. . . are typically law-abiding people who have made a mistake or error in their behavior... Officers are encouraged to exercise understanding and compassion when deciding to take enforcement action, and consider how they or a member of their family would like to be treated in similar circumstances." ROA.492-93 [GO 7.1 (IV)(B)(3)].

In addition, General Order 7.3 (V) titled "Arrests with a Warrant" instructed officers that "prior to executing an arrest warrant, the officer in charge shall notify his/her chain of command." ROA.501. And when planning the execution of an arrest warrant:

> Officers need not execute the warrant at the first possible opportunity to do so but may choose the time and place in accordance with these rules. However, an officer shall not select the time and place of arrest solely to embarrass, oppress, or inconvenience the arrestee.

ROA.501 [GO 7.3 (E)(4)]. Thus, the general custom of the Godley police was *not* to arrest for nonviolent misdemeanors in which no damage to property or threat of injury was present. ROA.387-409. Indeed, the only arrest warrant ever obtained for tampering with a governmental record in the City of Godley was in Thompson's case. ROA.405 [designation "m42379"].

Despite this policy and custom of *not* arresting for nonviolent misdemeanors Arbuthnot sought and obtained an arrest warrant for this nonviolent misdemeanor.

### C. FALSE PROBABLE CAUSE AFFIDAVIT IS SUBMITTED TO MAGISTRATE.

Upon information and belief, police communicated with the assistant county attorney (ACA) at the direction of the Mayor and prompted her to look at a probable cause affidavit, which included knowingly false and misleading statements and omitted critical facts. And for the same reasons the magistrate was fooled, so too was the ACA.

The probable cause affidavit is signed by Arbuthnot and dated February 7, 2023 and indicates the facts known to him amount to a violation of section 37.10(a)(1) of the Texas Penal Code. ROA.375. Section 37.10(a)(1) makes it unlawful to: knowingly make a false entry in, or false alteration of, a governmental record. The false and misleading information included in this affidavit is explained below in the Argument, Part II.

### D. THOMPSON IS ARRESTED MINUTES BEFORE THE MEETING AND HELD IN JAIL OVERNIGHT.

After prompting the ACA to review the affidavit before it was taken to the magistrate, the ACA reviewed it without confirming the truthfulness or completeness of the affidavit and determined, based on

the information contained within the affidavit that it was "good to go." ROA.853-54 [¶¶144-47]. This was ***not*** an order to seek arrest. Police then presented it to a magistrate, who signed the warrant. ROA.856[¶153].

Even though this was a nonviolent misdemeanor warrant, and no exigent circumstance existed compelling police to take Thompson into immediate custody, Arbuthnot entered the warrant into the Johnson County Sheriff's Office system as a "felony warrant" to ensure Thompson was quickly arrested. ROA.377. And Templer, who participated in the investigation and was aware the DA had rejected the felony case, nevertheless executed the "felony warrant" within minutes after receiving it. ROA.373, 377-79. Templer did so with knowledge that Thompson was a city council member about to enter the city council meeting, and with knowledge that the crime for which she was being was arrested was a misdemeanor for which, he knew or reasonably should have known, no probable cause existed, and for which arrest was not immediately necessary. ROA.858[¶¶161-63].

Thompson was arrested while she was sitting in her car in front of City Hall preparing for the city council meeting. ROA.373. She was

handcuffed, transported to jail, strip searched, and detained in a jail cell overnight. Godley Police had never before arrested anyone who was accused of tampering with a governmental record, much less under these circumstances. ROA.860 [¶168]. Meanwhile, at the meeting the Mayor installed his appointees for City Attorney and City Secretary over the opposition votes of Papenfuss and Cornelison by breaking tie votes for his appointees. ROA.859 [¶165].

Thompson's arrest immediately generated much media attention. Three days after Thompson's arrest, and after learning of the true circumstances leading up to the arrest, the same ACA who had sent the "good to go" email, refused to prosecute. ROA.383. Upon information and belief, the ACA rejected the case because she was misled by Godley police. ROA.860 [¶169].

Following an election, a vote of "no-confidence" was entered by a newly-elected city council at a special called meeting held on May 23, 2023. ROA.861 [¶172]. The vote of no-confidence was based in part on Thompson's arrest. ROA.861 [¶172]. In support of the resolution, Papenfuss publicly accused the Mayor of directing police to arrest

Thompson for the purpose of creating tie votes at the February 7, 2023 meeting. The Mayor, who was present at the meeting, did not deny the veracity of Papenfuss's statement.[18] Following this no-confidence vote, the citizens of Godley in the gallery erupted in approving applause. Shortly after this meeting, the Mayor resigned. ROA.861[¶172].

## VII.     THOMPSON FILES SUIT.

Thompson filed suit on June 28, 2023, and raised the following claims: (1) false arrest under *Franks v. Delaware*; (2) malicious prosecution; (3) First Amendment retaliation; (4) failure to Intervene; and (5) conspiracy. ROA.13-37. Defendants did not answer the complaint. Instead, on August 21, 2023 and August 28, 2023, they moved to dismiss for failure to state a claim under Rule 12(b)(6). ROA.96-118, 119-46. Although no affirmative defense of qualified immunity was raised because the individual defendants had not yet filed their answer, they nevertheless raised qualified immunity as a basis to grant their motion to dismiss. ROA.113-15. In response, Thompson amended her complaint as a matter of right on September 11, 2023 to, among other things,

---

[18]    *See* https://www.youtube.com/watch?v=Twyq5VDBQaI (City of Godley Special Called Council Meeting, May 23, 2023 @ 2:58-3:03) (last visited May 22, 2025).

dismiss a defendant (A. Rizzo) and remove the claim for failure to intervene. ROA.161-193.

## A.   DEFENDANTS MOVE TO DISMISS UNDER RULE 12(B)(6).

Defendants refiled their motions to dismiss on September 25 and 26, 2023. ROA.212-40, 242-60. The City primarily argued Thompson's claims failed because (1) the Mayor's unconstitutional conduct could not be attributed to the City (ROA.223-228.); and (2) a magistrate found probable cause to arrest. ROA.213, 230-31.

According to the Individual Defendants, Thompson's claims failed in relevant part because: (1) a *Franks* claim was insufficiently alleged (ROA.248-54.); (2) the malicious prosecution claim failed because the arrest was based on a warrant (ROA.254-56.); and (3) police had probable cause to arrest (ROA.256-57.); and (4) they are entitled to qualified immunity because no constitutional violation occurred. ROA.258-59.

Thompson responded to these motions on November 7, 2023 and November 10, 2023. ROA.535-69, 570-99. And relied on an Appendix to which she attached evidence. ROA.328-534. The Appendix was necessary because Thompson's pre-suit attempts to obtain the relevant police

reports via the Texas Public Information Act were unsuccessful. ROA.207-08, 734. According to the City, under the Act's litigation exception, it was entitled to withhold the police reports until Thompson filed her lawsuit. ROA.730. But after Thompson filed her lawsuit, the City continued to withhold the police reports on the ground that *Carswell v. Camp* prevented their production. ROA.208-09, 763-65.[19] Eventually, after plaintiff's counsel threatened to move to compel, the City produced the reports, but not before the deadline to amend as a matter of right expired. ROA.766-68.

Thompson's Appendix attached twelve exhibits, which included the relevant police reports (ROA.330-73.), the probable cause affidavit and warrant (ROA.374-76.), the February 7, 2023 arrest and jail records (ROA.377-382.), the county attorney's correspondence rejecting the criminal case (ROA.383.), various emails (ROA.384-86, 472.), a Johnson County Jail Record surveying Godley Police arrests between 2019 and

---

[19]    The City's objection, raised on October 5, 2023, to producing the reports was based in part on the incorrect assertion that the Individual Defendants "sought a stay of all discovery." ROA.765. That stay was not requested until May 29, 2024. ROA.956-59. And it was prompted by Thompson's motion to compel defendants to exchange mandatory initial disclosures under Rule 26(a)(1)(A). ROA.887-95.

2023 (ROA.387-410.), relevant available agendas and minutes (ROA.411-69.), and the Godley Police Department's General Orders. ROA.473- 534.

In her responses to the City's motion to dismiss, Thompson argued in relevant part: (1) her facts fell within the *Lozman v. City of Riviera Beach*, and *Mt. Healthy* line of cases because Thompson alleged the Mayor, who is a policymaker, made the final decision to punish Thompson for adding agenda items to the agenda, and these cases did not require her to prove the absence of probable cause to state a retaliatory arrest claim against the City (ROA.584-87.); (2) the Mayor is a policymaker in the area of law enforcement in this context because by virtue of his elected position, state law gave him the authority to "order the arrest of a person who violates a state law or a municipal ordinance in the presence of the mayor." ROA.590-92.

In response to the Individual Defendants' motion, Thompson argued in relevant part: (1) the independent intermediary doctrine did not apply because police included false statements in the probable cause affidavit (ROA.549-50, 556-60); and (2) alternatively, even if probable cause existed, the exception to the probable cause requirement

articulated in and *Nieves v. Bartlett* applied (ROA.553-55.), and in support of the "objective evidence" requirement Thompson repeatedly pointed to (1) a survey of arrests; the Department's General Orders; and the fact that Papenfuss was not arrested. (ROA.633-36, 1049-51,1124.)

B.    **THOMPSON OBTAINS LEAVE TO AMEND HER COMPLAINT AND DEFENDANTS REFILE DISMISSAL MOTIONS.**

On December 21, 2023, a *Dallas Morning News* journalist contacted plaintiff's counsel. ROA.774. The journalist wrote: "counsel for individuals gave me the attached" (ROA.774.), and said he was instructed to give it to plaintiff's counsel. Attached was an email containing a single sentence sent by Assistant County Attorney Angela Allen to Arbuthnot on February 7, 2023 which states in its entirety "your affidavit is good to go." Allen was the same ACA who had refused to accept the misdemeanor case for prosecution three days after Thompson was arrested. ROA.383. That email was never produced to Thompson before it was disclosed to the journalist. This single sentence did not indicate the county attorney had ordered the arrest, or what prompted her email. And because the ACA refused to talk to plaintiff's counsel, that information has not and

could not be discovered absent compulsory process, which was not possible due to *Carswell*.

Next, on February 13, 2024, while the motions to dismiss were pending, the City filed a notice of supplemental authority advising the district court that this Court sitting *en banc* had recently decided *Villarreal v. City of Laredo, Texas*, 94 F.4th 374 (5th Cir. 2024). ROA.619-26. In a lengthy fractured opinion, this Court briefly referenced the "objective evidence" standard mentioned in *Nieves*, and did not analyze *Monell* liability. The City nevertheless argued that the Court's brief reference meant that Papenfuss did not qualify as a "similarly situated individual," and therefore no "objective evidence" existed to trigger the *Nieves* exception.

Thompson responded that *Villarreal* was inapplicable to the retaliatory arrest claim brought against city policy makers and that the facts were otherwise distinguishable. ROA.627-30. Thompson also emphasized she had alleged probable cause was *absent* (ROA.630-33.) and that to the extent *Nieves* exception applied it applied only to the retaliatory arrest claims brought against the individual officers and that

the facts alleged regarding Papenfuss were sufficient to meet the "objective evidence" standard articulated in *Nieves*. ROA.633-36. Also, on March 20, 2024 the Supreme Court heard arguments in *Gonzalez v. Trevino*, 602 U.S.653 (2024), whose facts were almost identical to Thompson's, and involved a *Nieves* claim. ROA.650-59. The arguments suggested the Court was poised to overrule this Court's interpretation of the "objective evidence" standard articulated in *Nieves*.

Accordingly, on March 28, 2024, Thompson moved for leave to file her Second Amended Complaint (SAC). ROA.650-59, 803-10. Thompson's motion sought in part to incorporate the facts gleaned from the police reports and other evidence; and to add a procedural due process claim in light of the Supreme Court oral arguments *in Gonzalez*. Over Defendants' objections, (ROA.787-96, 797-802.), to which Thompson responded, (ROA.803-09.) the Court granted leave. ROA.811. Defendants refiled their motions to dismiss on May 20-21, 2024. ROA.896-927, 932-54.

This time, Defendants argued: (1) Thompson failed to "present" objective evidence triggering the *Nieves* exception to the absence of probable cause requirement (ROA.911-12.); (2) the independent

intermediary doctrine barred her claims (ROA.912-15.); (3) she failed to allege a policymaker adopted a policy that caused her deprivations (ROA.915-22.); (4) failure to supervise claims were foreclosed. (ROA.922-23.); (5) her *Franks* claim was conclusory (ROA.939-47.); (6) probable cause barred her claims (ROA.947-49.); (7) abuse of process is not viable in this circuit (ROA.951.); and (8) alternatively, the individual defendants are entitled to qualified immunity. ROA.951-52. On June 10-11, 2024, Thompson responded to defendants' motions. ROA.984-102, 1022-1048.

In response to the City's motion, Thompson cautioned the district court that the City continued to misconstrue and mischaracterize her pleadings to form a narrative that was *not* pled. ROA.990 [fns. 1-2]. Thompson's responses argued: (1) she alleged probable cause was absent (ROA.1007-09, 1036-38.); (2) the independent intermediary doctrine was inapplicable (ROA.1028-36, 1001-07.); (3) the Mayor is a policymaker and he created and implemented a policy that caused her deprivations (ROA.992-96.); (4) failure to train/supervise on First Amendment limitations were alternative policies that also contributed to her

deprivations and were not foreclosed (ROA.996-98, 1012-14.); (5) a *Franks* claim was sufficiently alleged (ROA.1002-07,1028-36.); (6) if necessary, "objective evidence" existed to trigger *Nieves'* exception (ROA.1010-12, 1038-40.); (7) procedural due process claims are viable (ROA.1045-48.); and (8) the individual defendants are not entitled to qualified immunity. ROA.1048.

## C. Supreme Court decides *Gonzalez* and vacates *Villarreal*.

On June 20, 2024, five months after *Villarreal* was decided, the Supreme Court issued its opinion in *Gonzalez,* which clarified the "objective evidence" standard required to meet the *Nieves* exception. Thompson advised the district court of the decision the same day it was issued. ROA.1049-51. And again to support her alternative *Nieves* argument, Thompson pointed to the following objective evidence: (1) survey of arrests; (2) General Orders; and (3) the fact that Papenfuss was not arrested. ROA.1049-51.

On October 15, 2024, the Supreme Court vacated this Court's decision in *Villarrea*l and remanded it here for consideration under *Gonzalez.*  Despite vacatur, the City continued to represent to the district

court that *Villarreal* was dispositive of Thompson's retaliatory arrest claim against the City (ROA.1117-19.), which Thompson again disputed. ROA.1122-23. And for the fourth time Thompson pointed to the "objective evidence" pleaded in her complaint and contained in the record, which consisted of the survey of arrests, the General Orders, and the alleged facts establishing Papenfuss was not arrested. ROA.1124.

On April 28, 2025, after the district court dismissed Thompsons' claims, this Court issued its remand decision in *Villarreal*. The Court determined that the officers' conduct pre-dated the *Nieves* decision. Qualified immunity thus shielded them from liability. *Villarreal v. City of Laredo, Texas*, 134 F.4th 273, 275 (5th Cir. 2025). But here, the officers' conduct occurred *after Nieves* was decided. Accordingly, *Villarreal* is not helpful in this case.

### D. THE DISTRICT COURT ERRONEOUSLY CONCLUDES PROBABLE CAUSE DEFEATS THOMPSON'S CLAIMS.

On January 7, 2025, without discussing, analyzing, or applying *Lozman,* the district court dismissed Thompson's complaint under Rule 12(b)(6) because it determined (1) it was "unclear" whether the Mayor's alleged unconstitutional conduct could be attributed to the City

69

(ROA.1141-44 [fn.7].), (2) Thompson failed to allege a "policy" because (a) she did not allege a persistent custom of retaliation (b) the single decision exception did not apply; and (c) her arrest was not a foreseeable consequence from the City's failure to train its officers on First Amendment limitations (ROA.1141-45.); (3) probable cause existed to arrest her for tampering with a governmental record because the independent intermediary doctrine applied in that (a) no false statements appeared in Arbuthnot's affidavit; (b) Arbuthnot's omissions did not establish falsity (ROA.1145, 1148-55.); and (3) no "objective" evidence triggered the *Nieves'* exception because Papenfuss is not a "similarly situated individual." ROA.1146-48. The Court did not address Thompson's procedural due process claim, nor did it address the qualified immunity defense.

## SUMMARY OF ARGUMENT

Despite Thompsons' allegations to the contrary, and without examining Texas cases addressing the elements of tampering with a governmental record, the district court erroneously concluded that Thompson had failed to show her "arrest lacked probable cause." The

district court's failure to examine the statutory elements *before* considering Thompson's *Franks'* allegations made invisible the context in which the probable cause statements were made, which caused the district court to improperly make credibility determinations and erroneously conclude the probable cause affidavit contained no false or misleading statements.

Moreover, when analyzing the alternative *Nieves'* argument, the district court erroneously applied the same "similarly situated" standard the Supreme Court recently rejected in *Gonzalez v. Trevino*, and ignored the other objective evidence on which she relied, including the survey of arrests, the Department's General Orders, and other alleged facts. Finally, the district court's failure to analyze under *Lozman*, Thompson"s allegations that the Mayor was the relevant policymaker for *Monell* purposes, led the district court to erroneously conclude no policy was pled.  For these and other reasons discussed below, the district court's judgment should be reversed.

# STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *PHI Grp., Inc. v. Zurich Am. Ins. Co.*, 58 F.4th 838, 841 (5th Cir. 2023). "Under 12(b)(6), the court must accept well-pleaded facts as true and view facts in the light most favorable" to Thompson. *Id.* "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

# ARGUMENT

## I.   PROBABLE CAUSE WAS ABSENT AS A MATTER OF LAW.

The Fourth Amendment provides:

> The right of the people to be secure in their persons. . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation. . .

U.S. Const. Amend. IV. Probable cause means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to

commit an offense." *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 391 (5th Cir. 2017). In this case, to support the arrest warrant, Arbuthnot swore under oath that the facts known to him on February 7, 2023, were sufficient to show a violation of section 37.10(a)(1) of the Texas Penal Code. ROA.375. Not only does Thompson allege no reasonable person of caution could have believed she committed a crime, she alleges Arbuthnot knew she had not committed a crime and intentionally sought to obscure her innocence.

Section 37.10(a)(1) makes it unlawful to: knowingly make a false entry in, or false alteration of, a governmental record. Tex. Penal Code §37.10 (a)(1). "Governmental record" is defined in relevant part as: (A) "anything belonging to, received by, or kept by government for information, including court records." Tex. Penal Code § 37.01 (2)(A). In Texas, *personal copies* of governmental records are not considered "governmental records" for purposes of this statute and have never formed the basis of a criminal complaint. This makes sense because when a person works in government, "edits" "entries" and "alterations" to government records happens on a daily basis, and enforcing an

interpretation to include *copies* would prove too onerous. Which is why the tampering statute, like many tampering statutes around the country do not protect *personal copies* of government records. *See, e.g., State v. Brantner*, 360 Md. 314, 329-332 (Md. 2000)(citing *United States v. McCoy*, 47 M.J. 653, 654 (1997).

In *Branter*, to determine whether a personal copy of an official court letter written by a judge that was altered by a criminal defendant was a public record, the high court in Maryland surveyed tampering statutes in states around the country that encountered similar situations. After doing so, the court concluded that the purpose of these tampering statutes was *not* to protect "personal, officially generated copies of public records." *Id.* at 332. Rather, the intent is to "prevent conduct which deprives the government of the use of its documents." *Id.* at 333. The Maryland court relied in part on a case in which a military soldier altered a *copy* of her Personal Change of Station ("PCS") order to reflect she should be stationed in a location that differed from the original order. The military court determined no violation of the relevant tampering statute occurred because:

we do not construe the definition [of public record] to lower it to the individual ownership level. To hold every personal copy of one's PCS orders is a public record would, in effect, make every airman an official custodian of those copies, for we believe that is the only means for imposing individual criminality for not protecting one's personal copies as a public record. Plainly, as currently drafted, there is insufficient notice in the offense to do so. . . . in the absence of clear proscriptions, we must restrict its applications to reasonable parameters.

*United States v. Isler*, <u>36 M.J. 1061, 1064</u> (A.F.<u>C.M.R. 1993</u>).

Here, it is undisputed that Thompson made an entry to a *personal copy* of the agenda, not the original agenda that at all times remained posted unaltered in a locked glass box in front of city hall. When the required posting time expired, the original agenda was removed from the box and kept by the official city custodian for information. Because the original government record was unaltered it could and was kept for information purposes. And there is no evidence that Thompson ever touched it, much less tampered with it. The only document these officers could say was altered was Thompson's *copy*, which is not a governmental record kept by the City "for information."

While it is true that when Thompson sent her copy back to the city secretary with her added items for posting, it *became* a governmental

record that the city was required to keep. But at the time Thompson made her entries, her personal copy was not yet a "governmental record" and therefore her conduct did not violate section 37.10(a)(1) as a matter of law. *See, e.g., Pokladnik v. State,* 876 S.W.2d 525, 527 (Tex. App.—Dallas 1994, no pet.) (holding violation of 37.10(a)(1) was not shown because government forms were not yet received by the government when defendant made his entries)(relying on *Constructors Unlimited Inc. v. State*, 717 S.W.2d 169 (Tex. App.—Houston [1st Dist.] 1986, pet ref'd)(explaining entries to documents before they become governmental records does not violate section 37.01(a)(1).)

Nor does the fact that Thompson was a city council member change the analysis. Thompson used her personal computer to make her entries She did not enter them it into a government database system, nor did she originate a document with intent to defraud or harm another. In *Hernandez v. St*ate, 577 S.W.3d 361 (Tex. App.—Houston [14th Dist.] 2019, no pet.) a police officer created a false police report on a criminal justice database system and thereby simultaneously created a government record while making false entries. *Id.* at 366-67. Those are

not the facts here. Thompson, as a city council member had authority to enter agenda items into an agenda and to direct the city secretary to perform her ministerial duty to post them in compliance with TOMA, which is all she did.  For these reasons, no crime was committed as a matter of law, and these officers could not have had probable cause to arrest her.

## II.    THE INDEPENDENT INTERMEDIARY DOCTRINE IS INAPPLICABLE BECAUSE THOMPSON SUFFICIENTLY ALLEGES A *FRANKS* CLAIM.

A Fourth Amendment violation is established when an officer intentionally or with reckless disregard for the truth includes a false statement in or omits material facts from a warrant application. *Franks v. Delaware*, 438 U.S. 154 (1978).  "[A] neutral magistrate's signature will not protect the offending officers" if the circumstances show "no reasonably competent officer would have concluded that a warrant should issue." *Hughes v. Garcia*, 100 F.4th 611, 619 (5th Cir. 2024)(citing *Terwilliger v. Reyna*, 4 F.4th 270, 281 (5th Cir. 2021)).

Consequently, "an officer cannot avoid liability where a warrant affidavit (1) contains false statements or material omissions (2) made with at least "reckless disregard for the truth" that (3) were "necessary

to the finding of probable cause." *Id.* This is how the courts have adapted the standard and requirements set out in the criminal context of *Franks* to the civil context for civil rights violations. "[I]f a plaintiff makes the tripartite *Franks* showing, then any arrest or prosecution lacked probable cause, the defendant officers are not entitled to the protection of the independent intermediary doctrine, and the misstatements or omissions suffice to establish a Fourth Amendment violation." *Id.* (citing *Terwilliger*, 4 F.4th at 281–82).

At the pleadings stage, Thompson's burden is not onerous. For a *Franks* claim to survive a motion to dismiss, Thompson "need only point out specifically the portion of the warrant affidavit that is claimed to be false ... accompanied by a statement of supporting reasons." *Hughes*, 100 F.4th at 620 (internal quotations omitted). By pleading such facts, Thompson meets her "burden of alleging a *Franks* violation sufficient to withstand the test of *Iqbal/Twombly*." *Id.*

Here the following false statements are included in Arbuthnot's affidavit*:*

**1. Statements that Arbuthnot met with Jessica Hill on 12/22/2022 and she "is" the City Secretary for the City of**

**Godley" and that she advised "she is the *only* one who creates and *publishes*" the agenda are false.** ROA.375 [¶2].

The police reports show Arbuthnot did *not* immediately meet with Hill on the day the alleged tampering occurred. Rather, he met with her five days later, after *he* noticed a "discrepancy" between the posted agenda and the agenda on Papenfuss's Facebook page. Also, Jessica Hill *resigned* as City Secretary on January 6, 2023. ROA.469. She was therefore *not* the City Secretary at the time Arbuthnot signed the affidavit.

Next, Hill *never* told Arbuthnot she "was the only one who creates and *publishes* the agenda." It was the Mayor who said the secretary creates the agenda, but he never said the secretary is the *only* one who "publishes" the agenda. ROA.359 [last¶]. Rather, the Mayor said that the secretary is the only one who "posts" the agenda, which is materially different from "publish."

Arbuthnot deliberately changed the word "post" to "publish" because Arbuthnot was aware the original agenda had been physically *posted* at city hall and was unaltered. Arbuthnot was also aware the secretary was not tasked with *publishing* the agenda on the city website,

because Jim Face did that. ROA.368.  And "publishing" the agenda, could
be done by anyone with a *copy*. Physically posting at city hall, on the
other hand, could only be done once and required the original document.
Finally*,* as demonstrated in the emails within Arbuthnot's possession, he
was aware council members, including Thompson, *shared* in the
responsibility of "creating" the agenda because the secretary was
required to include agenda items submitted by council members.

   **2. Statement that the secretary had asked Thompson
   whether she had edited the "*original* City Council
   Meeting Agenda document" is knowingly false**. ROA.375
   [¶6].

   Hill wrote in her written statement that she asked Thompson
whether she "had edited my document." ROA.337.  Hill's written
statement did not state that Thompson had admitted to editing Hill's
"*original*" document, which was impossible because it was physically
posted at city hall. So Arbuthnot inserted "original" himself to give the
*false* impression that Hill had reported the *original* document was
altered when he was aware it was not.  Arbuthnot was aware that the
original document was physically ***posted*** at city hall and that it had
remained there ***unaltered*** until the secretary removed it and kept it for

information purposes because Templer documented that fact in his report. ROA.334 [last sentence in paragraph that begins "The document Ms. Thompson"], 342-45.

### 3. Statements that Thompson had "forged" a document and "forged" the secretary's signature were knowingly false. ROA.375 [¶4-6].

Officer Arbuthnot repeatedly stated that Thompson had "forged" (a criminal legal term) a document, which he knew was false because the ADA had advised him directly that the answers the secretary gave in response to police questions about her signature and the document did not establish they were forged because the back-and-forth email communications between the secretary and Thompson conclusively demonstrated the secretary was referencing a *copy*, not the original document.  Also, on February 7, 2023 the agenda did not appear on the city's website. Therefore Hill's signature, which was *electronic*, could not be viewed or compared to the alleged "forged" signature on the corrected copy, which shows no "forgery" occurred.

### 4. Statement that Thompson's "edit" "could have" misinformed citizens/city council members was false.

Section 37.10(a)(1) requires that the alteration be made to a document that the government must keep for "information purposes." It is a defense to prosecution under § 37.10 (a)(1) that the allegedly false entry or false information "could have no effect" on the government's purpose for requiring the governmental record. *See* Tex. Penal Code Ann. § 37.10(f). Thus, to overcome this defense, Arbuthnot wrote "due to [Thompson] doing the editing city council agenda [sic] the government document ***could have misinformed*** citizens/city council members of Godley" about the topics of discussion for the December 27 meeting. ROA.376 [¶10 (a)-(h)]. This statement is false as a matter of law for several reasons.

First, when Thompson added the agenda items, she did so on a *personal copy,* not the original, and she did not "create" the agenda herself. Therefore at the time she made her entries, it was not a "government document." In addition, when she sent the corrected copy to the city secretary, who received it,  for *posting*, it *became* a government document. But at the time Thompson sent it to the secretary, who had a

ministerial duty to post it, Thompson did not know the secretary would not post it, so it was not sent with intent to "misinform."

Second, an agenda that is never physically *posted* at city hall has no ***legal effect*** on the topics that will be discussed at the meeting.  Under TOMA "post" has a distinct legal meaning that the affidavit repeatedly intentionally and improperly conflates with "publish." TOMA provides: "A municipal governmental body ***shall post*** notice of each meeting on a physical or electronic bulletin board at a place convenient to the public ***in the city hall***." Tex. Govt. Code § 551.050(b). This distinction is meaningful in the context of this case because it is the *physical* "posting" *"in city hall"* that determines whether proper notice to the public was given. If an agenda is *not* posted at city hall, proper notice is absent and its contents cannot be discussed.

Here, when Arbuthnot emphasized falsely that the secretary is the *only* one who can "publish" the agenda on the city's website, rather than emphasizing her most important ministerial duty is to physically "post" the agenda at city hall, Arbuthnot is intentionally attempting to get around the fact that the original "official" agenda is always physically

posted at city hall. ROA.376 [¶9]. Therefore, Hill's agenda was physically posted at the time Thompson made her entries, which made it *impossible* for Thompson to have "altered" the "government record."

And "posting" an agenda on Facebook that was not *physically* posted *at city hall* has no **legal effect** because it will not *operate* as the agenda for council discussion at the meeting as a matter of law. Only the agenda physically posted at city hall could control discussion at the meeting, which is why Thompson kept directing the secretary to post the corrected agenda at city hall and why the Mayor and secretary refused.

And the city officials with authority to speak at the meeting about which agenda was p*hysically posted at city hall*, including the Mayor, were all aware that the corrected agenda was *not* posted at city hall, in part because Thompson told them. Therefore the Mayor, Thompson, Papenfuss, and the secretary, were all aware, and reasonably competent police officers should have known, that publishing the unposted corrected agenda on Facebook would have no *legal effect* at the meeting.

And to the extent that anyone was confused by the Facebook posting it could have been corrected during the public meeting and

memorialized in the minutes. But this was not done because the Mayor unilaterally cancelled the meeting and thereby deliberately perpetuated any confusion he and these officers claimed existed so that Thompson would be arrested.

### III. ALTERNATIVELY, THE *NIEVES* EXCEPTION TO THE ABSENCE OF PROBABLE CAUSE REQUIREMENT APPLIES.

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)(internal quotations and citations removed); *see also Keenan v. Tejeda,* 290 F.3d 252,258 (5th Cir. 2002)("First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities"). "If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." *Nieves* at 398*; see also Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 283–284, (1977).

"To prevail on such a claim, a plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury." *Nieves* at 398. Generally, in retaliatory arrest cases involving individual police officers, Courts require plaintiffs to plead and prove an absence of probable cause. *Nieves* at 399. This is so because "[w]hen an individual police officer has to make a "split-second" decision in the field about whether to arrest, discerning whether an arrest was caused by the officer's legitimate or illegitimate consideration of speech"' is difficult for courts to unravel. *Lozman* at 1953 (internal quotations removed).

Here, however, the decision to arrest Thompson was not made in a split-second by an individual officer in the field. Rather the decision to arrest was made with much time for thought and planning. Moreover, to avoid implementing an "unyielding requirement" that "could pose a risk that some police officers may exploit the arrest power as a means of suppressing speech," the Court carved out a narrow exception to the general rule in cases where "officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves* at 406. In

those cases, a plaintiff can point to "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves* at 407.

Here, while Thompson alleges these officers lacked probable cause as a matter of law and fabricated it by obscuring Thompson's innocence with false evidence, she pled in the alternative that she could also show but for retaliatory animus by the Mayor and the officers, Thompson would not have been arrested because these officers typically exercised discretion not to arrest under the circumstances existing here.

In support, she pointed to the following objective evidence, which the district court did not address: (1) the Godley General Orders demonstrating existing police policy instructed police to exercise discretion *not* to arrest under the circumstances existing here, [*see supra*, Statement of the Case VI(B)], (ROA.846-47 [¶120-22)], 1050-51.); (2) a 2019-2023 survey of Godley arrests demonstrating that police had never before arrested anyone for a misdemeanor offense of tampering with a government, (ROA.387-410, 849 [¶131], 856 [¶154], 857 [¶158].), and (3) Papenfuss, who committed similar conduct, was not arrested because the

Mayor only needed to silence one of his opponents to create the tie vote. ROA.832 [¶¶68-77], 856 [¶154]. Each of these allegations is sufficient to "plead" objective evidence to trigger the *Nieves* exception.

Despite all of this objective evidence, the district court ignored nearly all of it. It considered only the allegation that Papenfuss was similarly situated to determine that he could not serve as a "comparator," and concluded that Thompson had not "produced objective evidence that she was arrested when other similarly individuals not engaged in the same sort of protected speech had not been." ROA.1147-48. This was the exact "cramped view" interpretation of the "objective evidence" standard the Supreme Court rejected in *Gonzalez*, and is therefore error. *See Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024).

But more importantly, Thompson's arrest survey is exactly the type of evidence that was presented in *Gonzalez* and that the Court found sufficient. *See Gonzalez* at 658, ("Gonzalez's survey is a permissible type of evidence because the fact that no one has ever been arrested for engaging in a certain kind of conduct. . . makes it more likely that an officer has declined to arrest someone for engaging in such conduct in the

past.")  The tampering statute is frequently used by law enforcement to protect government documents. However, it has never been used to prosecute someone for altering a *personal copy* of a government document as was done here because it is not a crime. Because Thompson can show objective evidence to trigger *Nieves*, even if the Court determines probable cause existed, it is *not* dispositive of Thompson's retaliatory arrest claims.

## IV.   THE MAYOR IS A *MONELL* POLICYMAKER AND HIS POLICY DECISION IS SUFFICIENTLY ALLEGED.

A local government may be sued under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible [for] under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).

### A.   WITHIN A TYPE A GENERAL-LAW MUNICIPALITY, THE MAYOR IS A *MONELL* POLICYMAKER.

The relevant "policy maker" in a section 1983 cause of action is the person or body who "possesses final authority to establish municipal

policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Moreover, "whether a particular official has 'final policymaking authority' is a question of *state law*." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (emphasis in original). To determine who is the relevant policymaker courts may look to "relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988) (internal quotations omitted). Indeed, "[a]mong the many kinds of municipal corporations, political subdivisions, and special districts of all sorts, one may expect to find a rich variety of ways in which the power of government is distributed among a host of different officials and official bodies." *Id.* at 124-125. "Once those officials who have the power to make official policy on a particular issue have been identified, it is for the *jury* to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity. *Jett* 491 U.S. at 737 (cleaned up) (emphasis in orig.).

Here, Thompson alleges the Mayor determined that entering agenda items into a personal copy of a posted agenda was punishable conduct for which the City should pursue arrest. Thompson believed she had a constitutional right, indeed a duty, as a council member to add omitted items to an agenda to ensure proper notice was given about the subjects she would be discussing at the meeting. Thompson alleges the Mayor's decisions to prevent her from adding her items and to punish her for exercising this right was made with retaliatory animus; that it stopped and chilled her speech; and that the Mayor would have made a different choice if he had agreed with the topics she wanted to discuss.

The Mayor's authority to render this decision arose from the Mayor's executive power, delegated to him by Texas law, to "prosecute" and "punish" municipal officers, Tex. Local Gov't Code §22.042(b), and "to order the arrest of a person who violates a state law. . . in the presence of the mayor." *Id.* at §22.042(e). State law, therefore delegates to the Mayor the authority to establish a "policy" setting forth standards of acceptable and unacceptable conduct for municipal officers and others. As well as to define the type of conduct that should be "punishable" and for which

"arrest" should ensue. Accordingly, whenever he invokes these powers he is making a policy decision that will set the precedent for the City going forward.

B.  **MAYOR'S CHOICE TO PUNISH AND SUPPRESS FIRST AMENDMENT ACTIVITY QUALIFIES AS A *MONELL* POLICY.**

Under *Monell*, "[t]he 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Moreover, "the word 'policy' generally implies a course of action consciously chosen from among various alternatives." *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 824 (1985). To meet the official policy requirement under *Monell*, "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur [.]" *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214 (5th Cir. 2019)(citing *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001)).

A policy does not have to be an ordinance passed by a legislative body or even written down. *See Pembaur,* 475 U.S. at 480. ("the power to establish policy is [not] the exclusive province of the legislature"); *id.*

("[t]o be sure, 'official policy' often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action"); *id.* (*Monell* "makes clear" that "other officials 'whose acts or edicts may fairly be said to represent official policy,'... may give rise to municipal liability").

Indeed, an "official policy" under *Monell* can be established through a single decision, when the official possessing final policy-making authority for an action made the decision that forms the basis of the § 1983 claim. *See Tuttle,* 471 U.S. at 823-24 (stating a single incident of unconstitutional activity is sufficient to impose liability under *Monell*, *if* "it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker"); *Pembaur*, 475 U.S. at 480 ("it is plain that municipal liability may be imposed for a single decision by municipal policymakers"); *St. Maron Properties, LLC v. City of Houston*, 78 F.4th 754 (5th Cir. 2023)(same). It merely needs to be alleged that the action was a *deliberate* choice. *St. Maron* at 760 (citing *Garza v. City of Donna*, 922 F.3d 626, 638 (5th Cir. 2019). And that deliberate choice needs to be made with *deliberate indifference* to the risk

that a violation of constitutional rights will follow such decisions. *See id.* at 761.

Here, the Mayor was not compelled to punish Thompson's conduct-- not only because it did not constitute a crime, but also because he had other more appropriate and effective options available to him to correct the offending conduct and its effects. State law also affords him the power to "give to the governing body any information, and shall recommend to the governing body any measure that relates to improving . . . good government of the municipality." Tex. Local Gov't Code §22.042.  Rather than choose to discuss and debate any disagreement he had with Thompson about the breadth of his authority to police the agenda, the Mayor elected to punish her for attempting to lawfully place agenda items on a meeting agenda by directing that she be criminally charged and arrested, even though this conduct was protected by the First Amendment.  Indeed the likelihood that the Mayor's selected form of punishment would stop and chill Thompson's speech was guaranteed.

These are all unconstitutional actions attributable to the City itself, not an employee, and they are therefore sufficient to allege *Monell*

94

liability arising from a city policy. *See, e.g., Lozman,* 138 S.Ct. at 1954 (allegation that the City "formed a premeditated plan to intimidate him in retaliation for his criticisms of city officials. . . [and] that the city itself . . executed that plan by ordering his arrest" was sufficient to allege "official municipal policy" caused constitutional deprivation); *see also Pembaur*, 475 U.S. at 485 ("In ordering the Deputy Sheriffs to enter petitioner's clinic the County Prosecutor was acting as the final decisionmaker for the county, and the county may therefore be held liable under § 1983.").

### C. *LOZMAN* AND *MT. HEALTHY* CONTROL THE CAUSATION ANALYSIS RELATED TO MAYOR'S CONDUCT.

In, *Lozman v. City of Riviera Beach*, 138 S.Ct. 1945 (2018), after a jury trial, the Supreme Court vacated a judgment for the City after determining that the jury was ***incorrectly*** instructed on the law related to retaliatory arrests brought against a municipality itself, rather than an individual police officer. *Id.* at 1955. There, the jury was erroneously instructed that plaintiff could prevail against the municipality *only* if he proved "the *arresting officer* was motivated by impermissible animus

against Lozman's protected speech and that the *officer* lacked probable cause to make the arrest." *Id.* at 1947 (emphasis added).

The Court found this instruction was given in error and held that when a plaintiff alleges a retaliatory arrest was executed at the direction of the municipality itself, a plaintiff "need not prove the absence of probable cause to maintain a claim of retaliatory arrest against the City." *Id.* at 1955. Instead, when a plaintiff alleges the City is responsible for her arrest the *Mt. Healthy* causation test is more appropriate. *Id.* at 1955 (referring to *Mt. Healthy City Bd. of Ed. v. Doyle*, 492 U.S. 274 (1977). *Lozman* set forth *Mt. Healthy's* burden-shifting test as follows:

> The plaintiff must show that the retaliation was a substantial or motivating factor behind the prosecution, and, if that showing is made, the defendant can prevail only by showing that the prosecution would have been initiated without respect to retaliation."

*Id.* at 1952. Applying *Mt. Healthy* to Thompson's factual allegations means the City cannot prevail by simply showing probable cause exists, it must show the Mayor would have directed that Thompson be punished and arrested *even if* she had been his ally rather than an opponent. The City has not made that showing.

While the plaintiff in *Lozman* alleged the offending policymaker was the city council, the Supreme Court did not limit the application of its holding to only legislative bodies. *See Lozman* at 1954-1955. Rather, the Court was concerned with the power of high-ranking *governmental officials*. Indeed, the Court observed:

> An official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer. An official policy also can be difficult to dislodge. A citizen who suffers retaliation by an individual officer can seek to have the officer disciplined or removed from service, but there may be little practical recourse when the government itself orchestrates the retaliation.

*Id.* at 1954. Here, Thompson alleged it was the Mayor, rather than the city council (of which Thompson was a member), who formed the unconstitutional policy to intimidate in retaliation for her expressive activity and to suppress her speech. The Mayor is an elected high-ranking government official cloaked in executive power. He is not an individual city employee who can be fired or reprimanded by a superior.

For these reasons, Thompson plausibly alleges that a policy formed by a policymaker caused her deprivations.

V.  **THE POLICE CHIEF IS A POLICYMAKER AND HIS POLICY IS SUFFICIENTLY ALLEGED.**

The custom and practice of the City of Godley, as codified in the Godley Police Department General Orders, delegated to the Police Chief final policy making authority over all Department Policy.  The General Orders provided "A policy is a statement of the department's philosophy on a given issue.  Department Policy is determine by the Chief of Police." ROA.475.  Plaintiff alleges that Police Chief Jason Jordan *confessed* that he was allowing the Godley Police to be used by city officials to retaliate against citizens who spoke up at city council meetings.  Without considering these allegations, and dismissing the subsequent examples, including the retaliation that occurred to Papenfuss and Thompson,  the district court erroneously determined that she had failed to allege a "persistent custom of retaliation for speech" by Godley police. ROA.1141. This was error.

A "persistent practice" that constitutes a "custom" may also fairly represents municipal policy that, in effect, was adopted by the policymaker. *See Phelan v. Cook Cty.,* 463 F.3d 773, 790 (7th Cir.2006) (P must introduce evidence that unlawful practice was so pervasive that

acquiescence by policymakers was apparent and amounted to policy decision), *overruled on other grounds*, *Ortiz v. Werner Enters.*, 834 F.3d 760 (7th Cir.2016). If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work." *Calhoun v. Ramsey,* 408 F.3d 375, 380 (7th Cir.2005); *see also Jackson v. Marion County,* 66 F.3d 151, 152 (7th Cir.1995); *Phelan v. Cook Cnty.*, 463 F.3d 773, 789 (7th Cir. 2006), *overruled by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).

Here, not only did citizens themselves directly notify the City that the Police Department was being used to retaliate against citizens who spoke on public concerns at city council meetings, the Police Chief himself admitted that it was happening and that he himself allowed it to occur. It is not surprising then that the Department's General Orders makes no reference to or provides no guidance on the First Amendment. Thompson alleges the Police Chief chose not to implement policy or training on the First Amendment because those with the power to require the training were the individuals benefiting from the retaliation.

Moreover, the allegations in this case sufficiently demonstrate that the Mayor and City Council were deliberately indifferent to the rights of citizens who were exercising their right to free to speech, like Thompson, because it was reasonably foreseeable that if they refused to implement the training, First Amendment violations would likely follow, which is what happened. *See City of Canton, Ohio v. Harris*, <u>489 U.S. 378, 388</u>, (1989) ("We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.").

To prove deliberate indifference, Thompson needs to show that the City was on notice that, absent additional specified training setting forth the protections the First Amendment provides and adopting consequences if those rights are violated, it was "highly predictable" that the Department would be used to direct the retaliatory arrest of a detractor. Not only was the police chief on notice, he was facilitating the conduct. "In order to establish supervisor liability for constitutional violations committed by subordinate employees, Thompson must show

that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." *Parker v. Blackwell*, <u>23 F.4th 517, 522</u>–23 (5th Cir. 2022) (citing *Wernecke v. Garcia*, <u>591 F.3d 386, 401</u> (5th Cir. 2009).

A failure to supervise claim arises when a plaintiff shows that (1) the defendant failed to supervise the alleged bad actor, (2) there is a causal connection between the infringement of the plaintiff's constitutional rights and the lack of supervision, and (3) the failure to supervise exhibited deliberate indifference to the plaintiff's constitutional rights. *Pena v. City of Rio Grande City*, <u>879 F.3d 613, 623</u> (5th Cir. 2018). Interim Police Chief Cantrell supervised Arbuthnot, who wrote the false affidavit with Cantrell's help. Both Cantrell and Arbuthnot had been accused of retaliating against Thompson before they initiated their investigation against Thompson, and the complaint was pending when the affidavit was written and when the arrest was made. Thus, not only is there a lack of supervision, but the supervisor himself was knowingly engaging in the same unconstitutional activity.

Finally, Thompson must allege facts plausibly establishing "a direct causal link between the municipal policy and the constitutional deprivation." *St. Maron* at 761–62; *Piotrowski v. City of Houston*, <u>237 F.3d 567, 580</u> (5th Cir. 2001). "A plaintiff must also show the requisite degree of culpability, which is at least deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Valle v. City of Houston*, <u>613 F.3d 536, 542</u> (5th Cir. 2010) (quotations omitted).

In sum, unconstitutional actions that are themselves directed and adopted by a high-level policy maker and final decision maker with deliberate indifference to the rights of others can and do trigger *Monell* liability. *See Pembaur v. City of Cincinnati*, <u>475 U.S. 469, 481</u> (1986). Consequently, it is sufficient, at this stage, for Thompson to allege under these facts that Interim Police Chief Cantrell was continuing the unconstitutional retaliation policy that Jordan began.

## VI. ABSENCE OF PROBABLE CAUSE IS NOT REQUIRED TO PROVE A PROCEDURAL DUE PROCESS CLAIM.

The Fourteenth Amendment provides in relevant part: "nor shall any State deprive a person of life, liberty, or property without due process

of law." U.S. Const. XIV Amend. Thompson raised a procedural due process claim in her SAC. ROA.877-78. She alleges police officers deliberately fabricated an affidavit and presented it to a magistrate to hide their true unconstitutional motive, which was to punish her for her protected First Amendment activity and to prevent her from attending the city council meeting.

A violation of the Fourteenth Amendment's procedural due process requirement occurs when a constitutionally protected liberty interest, like Thompson's freedom, was seized without due process. *See Cole v. Carson*, 802 F.3d 752, 771 (5th Cir. 2015) (recognizing that the Fourteenth Amendment guarantees a "due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person.").

This right was clearly established when these Defendants fabricated a criminal case to punish Thompson in retaliation for her First Amendment activity and to prevent her from attending the city council meeting. *See Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) ("[T]he right of criminal defendants to be free from false or fabricated evidence

was well settled by 1959 or earlier."). Plaintiff contends abuse of process is the appropriate common law analog for purposes of stating a §1983 claim for a deprivation of a Fourteenth Amendment right. ROA.877 (relying on *Hammervold v. Blank*, 3 F.4th 803, 812 (5th Cir. 2021), which sets out elements for abuse of process, including making an "illegal, improper, or perverted use of process"). But, even if it is not, Thompson still states a claim under the Fourteenth Amendment which was unaddressed by the district court.

## VII. INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW.

"A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation." *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011). In the district court, the individual defendants only challenged the first prong. As demonstrated above, defendants violated her First, Fourth and Fourteenth Amendment rights; Thompson's rights were clearly established on February 7, 2023; and the defendants acted objectively

unreasonable in light of *Franks v. Delaware*, <u>438 U.S. 154</u> (1978); *Keenan v. Tejeda*, <u>290 F.3d 252</u> (5th Cir. 2002); *Cole v. Carson*, <u>802 F.3d 752, 771</u> (5th Cir. 2015); *Nieves v. Bartlett*,  and *Thompson v. Clark,* <u>596 U.S. 36</u> (2022).

## VIII.     *Carswell* Should be Clarified

In this case, the police reports contained information that could not be obtained from any other source. They are public documents that should have been produced under the Texas Public Information Act (PIA) upon request, but were not. <u>ROA.330-373</u>. The City refused to produce unredacted copies based in part on the Act's litigation exception. <u>ROA.729-52</u>. To avoid delay, Thompson filed suit and expected the City to produce the reports soon after. <u>ROA.757-62</u>. It did not.  The City relied on *Carswell v. Camp*, <u>54 F.4th 307, 313</u> (5th Cir. 2022) to justify withholding these critical reports. <u>ROA.763-65</u>. And though the City eventually produced them, it withheld them for far too long.

In addition, the individual defendants used *Carswell* as a shield and sword. Through a back channel, the individual defendants provided information to Thompson that the City did not. <u>ROA.774</u>. The individual

defendants produced a single-sentence email from the assistant county attorney that they apparently thought was exonerating. It is not. In part because the email is devoid of any context as to what prompted it. And because *Carswell* expressly forbids depositions while the individual defendants motion to dismiss is pending, Thompson could not depose the ACA about the email. While the undersigned was ethically obligated to incorporate the email into her pleading, it failed to change the ultimate factual *allegations* in this case because it merely shows that the ACA was just as fooled as the magistrate.

As a result of these maneuverings, Thompson's ability to present her civil rights claims in a succinct and orderly manner was impeded by an overly broad reading, and impermissible manipulation, of *Carswell*. ROA.1163-71. Thompson respectfully requests that the Court clarify *Carswell* to explain district courts retain discretion to order the production of information that otherwise would be available under the PIA, including relevant police reports and communications that are critical to these kinds of claims. If public entities can successfully stall production of critical information in a PIA proceeding while

simultaneously using *Carswell* to withhold public information until they can obtain 12(b)(6) dismissals, the purpose of the PIA will be frustrated. Finally, if defendants believed the district court could have ordered this relief early on, it might have prevented the delayed piecemeal production of public information from the governmental entities involved in this case.

## CONCLUSION

For these reasons the district court's judgment should be reversed, the Court should find that fact issues exist regarding whether individual defendants are entitled to qualified immunity, and remand with instructions to permit discovery to proceed. Alternatively, in case the Court finds that the facts alleged in the complaint are insufficient, remand with instructions to permit Thompson to amend her complaint to allow her to conform her complaint to the evidence. Thompson also seeks any and all other relief to which she may show herself entitled.

Respectfully submitted,

*/s/ Ann "Ana" Marie Jordan*
Ann "Ana" Marie Jordan
Texas Bar No. 00790748
ajordan@carterarnett.com
Linda R. Stahl
Texas Bar No. 00798525
lstahl@carterarnett.com
**CARTER ARNETT PLLC**
8150 N. Central Expressway Suite 500
Dallas, Texas 75206
Tel: 214-550-8188
Fax: 214-550-8185

**ATTORNEYS FOR APPELLANT
JENNIFER THOMPSON**

# CERTIFICATE OF SERVICE

Pursuant to <u>Federal Rule of Appellate Procedure 25(d)</u> and Fifth Circuit Rule 25.2, I hereby certify that on June 11, 2025, the foregoing document was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit, using the electronic filing system of the Court.  I further certify that I have complied with the privacy and redaction requirements of <u>Federal Rule of Appellate Procedure 25(a)(5)</u> and Fifth Circuit Rule 25.2.13; that the electronic submission is an exact copy of the paper document; and that the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Additionally, on June 11, 2025, a true and correct copy of the foregoing document was served via ECF electronic notice through the Court's Notice of Docket Activity upon counsel for the City of Godley, Christopher D. Livingston, and counsel for the Individual Defendants, Christoher A. Klement who have consented in writing to accept such notice as service of this document by electronic means.

*/s/Ann "Ana" Marie Jordan*
Attorney for Jennifer Thompson

# CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Certificate of Compliance with Clerk Order on Type-Volume Limitation
Certificate of Compliance Typeface requirements and Type Style
Requirements

1.  This brief complies with the type volume limitation imposed by
    clerk order granting leave to file brief in excess of word count, not
    to exceed 17,347 words because:

    > this brief contains 17,327 words, excluding the parts of the
    > brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App.
    P. 32(a)(5) and the type style requirements of Fed. R. App. P.
    32(a)(6) because:

    > this brief has been prepared in a proportionally spaced
    > typeface using Microsoft Word for Microsoft 365 MSO in 14-
    > point Century Schoolbook.

/s/*Ann "Ana" Marie Jordan*
Attorney for Jennifer Thompson

Dated:  June 11, 2025